IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE WASHINGTON POST,
     One Franklin Square, N.W.
     Washington, D.C. 20071

THE BALTIMORE SUN COMPANY, LLC
d/b/a The Baltimore Sun
     501 North Calvert Street
     Baltimore, MD 21202

CAPITAL-GAZETTE COMMUNICATIONS,
LLC d/b/a The Capital
     888 Bestgate Road, Suite 104
     Annapolis, MD 21401
     [Anne Arundel County, Maryland]

CARROLL COUNTY TIMES, LLC
d/b/a Carroll County Times
     115 Airport Drive, Suite 170
     Westminster, MD 21157
     [Carroll County, Maryland]

APG MEDIA OF CHESAPEAKE, LLC d/b/a
     The Star Democrat
     29088 Airpark Drive
     Easton, MD 21601
     [Talbot County, Maryland] and

     The Cecil Whig
     601 N. Bridge Street,
     Elkton, MD 21921
     [Cecil County, Maryland] and

     The Maryland Independent
     4475 Regency Place, Suite 301
     White Plains, MD 20695
     [Charles County, Maryland]

COMMUNITY NEWSPAPER HOLDINGS,
INC. d/b/a The Cumberland Times-News
     19 Baltimore Street
     Cumberland, Maryland 21502
     [Allegany County, Maryland]

Civil Action No. _____1:18-cv-02527_____

OGDEN NEWSPAPERS OF MARYLAND, LLC
d/b/a The Frederick News-Post
     351 Ballenger Center Drive
     Frederick, MD 21703
     [Frederick County, Maryland]

SCHURZ COMMUNICATIONS, INC. d/b/a
The Herald-Mail
     100 Summit Avenue
     Hagerstown, MD 21741-0439
     [Washington County, Maryland]

MARYLAND-DELAWARE-D.C. PRESS
ASSOCIATION, INC.
     P.O. Box 26214
     Baltimore, MD 21210,

          Plaintiffs,

   v.

DAVID J. MCMANUS, JR., Chairman,
Maryland State Board of Elections
     151 West Street, Suite 200,
     Annapolis, MD 21401

PATRICK J. HOGAN, Vice Chairman,
Maryland State Board of Elections
     151 West Street, Suite 200,
     Annapolis, MD 21401

MICHAEL R. COGAN, Board Member,
Maryland State Board of Elections
     151 West Street, Suite 200,
     Annapolis, MD 21401

KELLEY A. HOWELLS, Board Member,
Maryland State Board of Elections
     151 West Street, Suite 200,
     Annapolis, MD 21401

MALCOLM L. FUNN, Board Member,
Maryland State Board of Elections
     151 West Street, Suite 200,
     Annapolis, MD 21401

LINDA H. LAMONE, State Administrator,
Maryland State Board of Elections
    151 West Street, Suite 200,
    Annapolis, MD 21401 and

BRIAN E. FROSH, Maryland Attorney General
    200 St. Paul Place
    Baltimore, MD 21202

All In Their Official Capacities,

            Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

For their complaint, Plaintiffs THE WASHINGTON POST, formally known as WP

Company, LLC, THE BALTIMORE SUN COMPANY, LLC d/b/a The Baltimore Sun,

CAPITAL-GAZETTE COMMUNICATIONS, LLC d/b/a The Capital, CARROLL COUNTY

TIMES, LLC d/b/a Carroll County Times, APG MEDIA OF CHESAPEAKE, LLC d/b/a/ The

Star Democrat, The Cecil Whig, and The Maryland Independent, COMMUNITY NEWSPAPER

HOLDINGS, INC. d/b/a The Cumberland Times-News, OGDEN NEWSPAPERS OF

MARYLAND, LLC d/b/a The Frederick News-Post, SCHURZ COMMUNICATIONS, INC.

d/b/a The Herald-Mail, and the MARYLAND-DELAWARE-D.C. PRESS ASSOCIATION,

INC. (collectively, "Publisher Plaintiffs"), allege as follows:

## NATURE OF ACTION

1.    Pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C.

§ 2201, this action challenges multiple provisions of a newly enacted Maryland statute, the

Online Electioneering Transparency and Accountability Act, that purport to impose new,

onerous requirements upon on-line publishers like plaintiffs who publish political advertising,

along with various penalties if they do not comply.  Specifically, Plaintiffs challenge Maryland

Election Law §§ 13-405, 13-405.1 and 13-405.2, as well as the definitions of § 1-101

incorporated therein by reference (these challenged provisions are referred to herein as the

"Act").

2.      These provisions are unconstitutional under the First, Fourth, and Fourteenth

Amendments to the United States Constitution in a number of independent ways – and especially

when taken in combination.  The challenged provisions purport to regulate paid political speech,

which has been long recognized as core political speech, dating back at least to the advocacy

advertisement at issue in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

3.      **First**, under the First Amendment (as applied to the States under the Fourteenth

Amendment), the right to the exercise of freedom of speech and of the press protects not only the

right to publish, but the right *not* to publish.  As a result, a long line of Supreme Court authorities

has held that compelled speech is unconstitutional.  Yet, the Act affirmatively compels the

Publisher Plaintiffs and other Internet websites to publish certain statements about political

advertising, potentially as often as every 48 hours.  Such provisions are unconstitutional on their

face.

4.      **Second**, the Act impermissibly requires newspapers and other websites to collect,

maintain, and to turn over to the State Board of Elections substantial information about political

advertising.  As a matter of constitutional law, there is a stark difference between requiring

speakers to disclose who they are and the source of their funding, and imposing that burden on

newspapers and other Internet publishers, especially in the circumstances here.

5.      First Amendment jurisprudence subjects regulations directly burdening speech to

exacting scrutiny, requiring that the government demonstrate a compelling governmental

interest, that the legislation be narrowly tailored to serve that interest, and that there be no less

restrictive alternative for accomplishing that interest.  Here, the principal interest articulated by the sponsors of the legislation is limiting foreign (especially Russian) online speech in our elections, based upon examples of such speech on national social media platforms like Facebook, Google and Twitter in advance of the 2016 election.

6.      Assuming that interest is compelling, the Act is not narrowly tailored to serve that interest and, as a result, burdens far more speech than is necessary.  As an initial matter, there is no evidence that any newspaper website in Maryland unwittingly published advertising surreptitiously placed by foreign nationals to disrupt the 2016 election.

7.      Moreover, the challenged provisions of the Act duplicate existing obligations imposed upon political speakers themselves.  Specifically, under the Maryland Election Law, including as expanded by other provisions of the legislation, persons and organizations engaged in political speech are themselves required to report most of the information to the State Board of Elections, which could, if it so wished, itself publish that information on its own website.  The Act is therefore not narrowly tailored to serve the asserted interest, and there is a less restrictive alternative for achieving that interest.

8.      Requiring newspapers and other websites to duplicate that work – and then to publish, maintain and produce upon demand all manner of information – is simply unnecessary to achieve the aims of the legislation.  That is particularly true where many newspapers do not already collect such information and will either endure a substantial burden to comply or will elect not to accept political advertising.  Indeed, Google has already announced in response to the passage of the challenged provisions of the Act that it will no longer accept political advertisements in Maryland, thereby depriving the electorate of substantial, legitimate political speech.

9.      **Third**, the applicable provisions of the Act are both vague and overbroad, and subject Publisher Plaintiffs to punishment without due process of law in violation of the First and Fourteenth Amendments.  For example, the Act applies to speech that "relates to" a candidate, prospective candidate, ballot measure, or prospective ballot measure, instead of using definitions used in other sections of the Maryland Election Law that much more precisely define the categories of speech covered by the legislation.

10.      And, the challenged provisions of the Act apply to any "Qualified Paid Digital Communication," which the legislation defines as "campaign material," while circularly defining "campaign material" to include "Qualified Paid Digital Communications."  The vagueness and broad sweep of these and other provisions is likely to chill core political speech about candidates and issues because speakers and the online platforms will be uncertain as to what speech is included and will therefore be likely to refrain from large swaths of speech to steer clear of the statutory prohibitions – as Google has already announced it will do.

11.      **Fourth**, the Act authorizes a court to enjoin newspaper and other Internet websites from publishing political advertisements.  There is perhaps no more well-established principle in the firmament of First Amendment law than the prohibition against such prior restraints.  Indeed, while the legislation requires notice and an opportunity to be heard by the advertiser, no such procedural protection is afforded to a newspaper or other Internet website who will be directly subject to the injunctive relief authorized by the Act.  This, too, violates the First and Fourteenth Amendments.

12.      **Fifth**, the requirement that newspapers and other websites turn over their records on demand without any showing also violates the Fourth Amendment.  In crafting its text, the Founders expressly applied its protections to "papers" – in addition to "persons," "houses" and

"effects" – precisely in reaction to the Crown's practice of seizing papers that it had not approved.

13.     In addition to these substantial constitutional infirmities, the challenged provisions of the Act also violate the Communications Decency Act of 1996, 47 U.S.C. § 230. Section 230 provides an immunity for on-line publishers of third-party created content, including advertisements, and pre-empts state legislation to the contrary.

14.     Plaintiffs seek a declaration that these provisions of the Act are unconstitutional and unlawful, as well as a preliminary and permanent injunction enjoining defendants from enforcing the Act against them.

## PARTIES

15.     Plaintiff THE WASHINGTON POST, formally known as WP Company, LLC, is a diversified media company that publishes, *inter alia*, *The Washington Post*, a daily newspaper first published in 1877, as well as www.washingtonpost.com.

16.     Plaintiff THE BALTIMORE SUN COMPANY, LLC, publishes *The Baltimore Sun*, the largest general-circulation daily newspaper in Maryland, as well as www.baltimoresun.com.  THE BALTIMORE SUN COMPANY, LLC is also the parent company of plaintiffs CAPITAL-GAZETTE COMMMUNICATIONS, LLC and CARROLL COUNTY TIMES, CAPITAL LLC.

17.     Plaintiff GAZETTE COMMMUNICATIONS, LLC is the publisher of *The Capital*, a daily newspaper serving the Maryland state capital and surrounding areas, as well as www.capitalgazette.com.

18.     Plaintiff CARROLL COUNTY TIMES, LLC is the publisher of the *Carroll County Times*, a daily newspaper, as well as www.carrollcountytimes.com.

19.     Plaintiff APG MEDIA OF CHESAPEAKE, LLC publishes (a) *The Star Democrat* in Easton, Maryland, a five-day-a-week newspaper published for over 200 years, as well as www.stardem.com; (b) the *Cecil Whig*, a two-day-a-week newspaper published since 1841, as well as www.cecildaily.com; and (c) the *Maryland Independent*, a two-day-a-week newspaper serving Charles County, Maryland since 1872, as well as www.somdnews.com.

20.     Plaintiff COMMUNITY NEWSPAPER HOLDINGS, INC. d/b/a The Cumberland Times-News, is the publisher of the *Cumberland Times-News*, a daily newspaper published in Cumberland, Maryland, which has published under various names for almost 200 years, as well as www.times-news.com.

21.     Plaintiff OGDEN NEWSPAPERSOF MARYLAND, LLC d/b/a The Frederick News-Post, is the publisher of the *Frederick News-Post* in Frederick, Maryland, a daily newspaper that has published continuously since 1883, and www.fredericknewspost.com.

22.     Plaintiff SCHURZ COMMUNICATIONS, INC. d/b/a The Herald-Mail, is the publisher of *The Herald-Mail* of Hagerstown, Maryland, a daily newspaper that traces its roots back to 1873, as well as www.heraldmailmedia.com.

23.     Plaintiff MARYLAND-DELAWARE-D.C. PRESS ASSOCIATION, INC. ("MDDC") represents all of the daily and most of the non-daily newspapers in Maryland, Delaware, and the District of Columbia.  Its members range from small, local publications with a limited online presence to special-interest publications, to mid-sized regional newspapers, to national newspapers.  A full list of its members is attached as Exhibit A to the Declaration of Rebecca Snyder in Support of Plaintiffs' Motion for Preliminary Injunction.

24.     Defendant DAVID J. MCMANUS, JR., is the Chairman and a Member of the Maryland State Board of Elections (the "Board").  The Board is an administrative agency of the

State of Maryland.  The predecessor to the Board, the State Administrative Board of Elections, was established in 1969 to ensure compliance with the requirements of Maryland and federal election laws by all persons involved in the election process.  The Board is made up of five members who serve four-year terms and represent both principal political parties – three of the majority and two of the minority party.  The members are appointed by the Governor, with the advice and consent of the Senate of Maryland.

25.    Defendant PATRICK J. HOGAN, is Vice Chairman and a Member of the Board.

26.    Defendant MICHAEL R. COGAN is a Member of the Board.

27.    Defendant KELLEY A. HOWELLS is a Member of the Board.

28.    Defendant MALCOLM L. FUNN is a Member of the Board.

29.    Defendant LINDA H. LAMONE is the State Administrator of the Board.

30.    Defendant BRIAN E. FROSH is the Maryland Attorney General.

31.    The Act provides that it is enforced, in whole or in part, by the Board, the Administrator and the Attorney General.  Accordingly, each of the defendants is sued in his or her official capacities.

## JURISDICTION AND VENUE

32.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 because it presents a federal question under the United States Constitution, under 42 U.S.C. §§ 1983 & 1988, and under the Communications Decency Act of 1996, 47 U.S.C. § 230.

33.    This Court also has jurisdiction to declare the legal rights and obligations of the parties pursuant to 28 U.S.C. § 2201 because the action presents an actual case or controversy.

34.     Venue is proper in this Court under 28 U.S.C. § 1391 because it involves officials of the State of Maryland, one of its agencies, and the constitutionality and legality of one of its statutes.

## FACTUAL ALLEGATIONS

### I.      Legislative Background

35.     The bill that ultimately was enacted into the law at issue, House Bill 981, was introduced and sponsored in the Maryland House by Delegate Alonzo Washington, Delegate Marc Korman, and Delegate Samuel "Sandy" Rosenberg on February 5, 2018.  On that same date, a companion bill, Senate Bill 875, was introduced in the Senate by Senator Craig Zucker.

36.     The committee hearings and comments on the floor of the Maryland House and Senate make clear that the impetus behind the bill was concern about both paid and unpaid speech appearing on social media platforms like Facebook, Twitter and Google.

37.     On February 20, 2018, the House Ways and Means Committee held a hearing on the bill.  In his introductory remarks, Delegate Washington described his bill as follows:

> This legislation seeks to create greater transparency and accountability for online political advertisements.  The legislation . . . . requires online platforms such as Facebook, Twitter, Google, uh and Google, that publish political online ads to retain a digital copy of the ad and maintain a public database of the name and address of the person who purchased the ad and the cost of the ad and [it] requires an online platform, online platforms to provide a digital copy of an online ad and the cost of the ad to the state Board of Elections within 48 hours after an ad is purchased by a foreign principal.  According to a recent study of the 2016 election . . . it appears that Russia-linked accounts purchased political ads on nearly every major online platform.  Facebook found ad buys totaling $150,000 linked to fake accounts suspected to be controlled by Russians, estimated that the Russia-linked ads were seen by at least 10 million people.  Twitter found accounts controlled by the Kremlin-linked network, RT, spent about $274,000 on ads in 2016.  This bill is made to make sure these kinds of acts do not happen here in the state of Maryland.[1]

---

[1] *Available at*: http://mgahouse.maryland.gov/mga/play/eb5126c2-5f0b-4512-a03c-c37ce18e159c/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (0:06:31 - 0:08:33).

38.     At that hearing, Delegate Rosenberg also offered testimony explaining that the

purpose of the legislation was to combat foreign election interference, asserting that:

> . . . our fundamental process of electing candidates to public office is now at risk
> and just indictments don't matter thus far because, since the indictments handed
> down by the Justice Department on Friday, we see even just after the shooting in
> . . . Parkland, . . . the Russian bots are at work.  So what this legislation would do,
> similar to the bill you just heard before, is to build upon our existing structure.
> For instance, to add on-line advertising to the existing definitions of campaign
> material, public communication, and electioneering communication to impose the
> same requirements that we already do on non-digital communications dealing
> with Maryland candidates in Maryland elections. . . .
>
> We're talking about sustained, systemic efforts to upset, diminish, destroy our
> fundamental system and I would hope, and I know, feel confident that the
> committee, as it has in the past, will take the appropriate action . . . .[2]

39.     Delegate Rosenberg later described the bill, in his 2018 Session Summary for

constituents, as "our first-in-the-nation response to the Kremlin's disruption campaign during the

2016 election."[3]

40.     On March 1, 2018, the Senate Education, Health, and Environmental Affairs

Committee held a hearing on Senate Bill 875.  Senator Zucker, the Senate bill's sponsor, testified

that:

> So we've heard, we've heard a lot about interference from other countries when it
> comes to ads and this legislation is a first attempt to sort of unveil the iron curtain
> and see exactly what the face is behind who may be placing some of these
> fraudulent ads.  I wanted the committee to know that we've been working with
> stake-holders like Facebook to make sure that we're taking appropriate action and
> also being a national leader on this.  And I believe that this legislation ultimately
> will be a national model. . . .  I will just very quickly go over the intent of the bill.
> The intent of the bill is, one, is to make sure that if there's any ads being put on
> what would be social media, it actually has to be done in US currency, right?  We
> don't want rubles buying ads in the United States for elections.  And the other

---

[2] *Available at*: http://www.delsandy.com/category/sandys-2018-legislative-diary/page/3/.

[3] *Available at*: http://www.delsandy.com/2018-session-summary/.

piece of it is, is we also want to make sure—and this is something that Facebook would work on—keeping a database of those folks that actually purchase the ads.[4]

41.     Publisher Plaintiffs are not aware of a single reference anywhere in the legislative history to any efforts to place deceptive foreign advertising on any newspaper's Internet website or, for that matter, on any platform other than Facebook, Google and Twitter.  Despite that, the legislation ultimately passed applies new publication, collection, and reporting requirements upon all Internet websites, including those of Publisher Plaintiffs.

42.     On May 26, 2018, the Online Electioneering Transparency and Accountability Act became law, with an effective date of July 1, 2018, pursuant to Article II, § 17(c) of the Maryland Constitution.  Article II, § 17(c) provides that "[a]ny Bill presented to the Governor within six days (Sundays excepted), prior to adjournment of any session of the General Assembly, or after such adjournment, shall become law without the Governor's signature unless it is vetoed by the Governor within 30 days after its presentment."  Specifically, Maryland Governor Larry Hogan did not sign the legislation, but allowed it to become law.

43.     The day before, on May 25, 2018, Governor Hogan announced in correspondence to the President of the Maryland Senate and the Speaker of the Maryland House of Delegates that he was allowing the bill to become law without his signature.

44.     After praising certain "laudable goals" underlying the statute, Governor Hogan explained that he was "not signing the legislation in light of serious constitutional concerns that have been expressed regarding the bill."  His official statement continued:

> Most disconcerting to me is the request for a veto that I have received from the Maryland-Delaware-D.C. Press Association, which represents all of the daily newspapers in our state.  The free press is a cornerstone of our republic, and the press corps' concern that this legislation would compel speech by news outlets is

---

[4] *Available at*: http://mgahouse.maryland.gov/mga/play/0f183b99-dfef-4eb4-8dbe-b1f6369a3d56/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (1:28:00-1:30:06).

a precedent I am deeply concerned about establishing.  I am cognizant that there
are opposing views on this issue, but I cannot sign a piece of legislation that could
allow the government to coerce news outlets protected by the First Amendment to
publish certain material.  A number of alternative approaches were recommended
– yet unfortunately rejected – that would have achieved the same ends of this bill
while ensuring the freedom of the press enshrined in the Constitution remains
intact.

45.     Governor Hogan's official statement also addressed the vagueness and

overbreadth of the Act:

Similarly, I am concerned that the legislation contains vague and overbroad
language that could have the unintended consequence of stifling the free speech of
citizens who are mobilizing on social media platforms.  Stipulating that online
materials that 'relate' to any candidate or prospective candidate [or ballot question
or prospective ballot question] are subject to disclosure and regulation by the
State Board of Elections casts a very wide net and I am concerned that groups that
are simply exercising their constitutional rights of free speech will unsuspectingly
be subject to regulation and possible criminal penalties for merely expressing a
political opinion.  The legislature could have more carefully drawn a distinction
between clear campaign activity versus protected political speech that shouldn't
be stifled by the fear of governmental regulation.  The constitutional strict
scrutiny of restrictions of political speech demands a more careful and precise
demarcation of what is subject to regulation and for what purpose.

46.     The Governor concluded by acknowledging that he fully "expect[s]" that there

"will be a constitutional challenge on these grounds."

## II.     The Challenged Provisions of the Act

47.     In addition to substantial requirements imposed directly on political advertisers,

the challenged provisions of the Act also impose onerous requirements in connection with the

publication of "Qualified Paid Digital Communications" on a variety of "Online Platforms,"

including those published by each of the Publisher Plaintiffs here.  This is achieved through a

series of overlapping definitions and regulations.

**A.     The Act Applies to "Online Platforms," Including Publisher Plaintiffs' Websites.**

48.     First, the Act imposes various requirements in connection with speech on any "Online Platform," which it defines as "any public-facing website, web application, or digital application, including a social network, ad network, or search engine, that" has "100,000 or more unique monthly United States visitors or users" and "receives payment for qualifying paid digital communications."  Md. Code, Elec. Law § 1-101(dd-1).

49.     Each of the Plaintiffs, except for MDDC, operates a website that has more than 100,000 monthly visitors or users.  MDDC appears in this action to represent the interests of its members, including those which operate websites that currently do not have 100,000 or more monthly visitors or users but which are likely to in the future, including as readers of traditional newspapers increasingly move away from print in favor of news websites.

**B.     The Act Applies to "Qualified Paid Digital Communications," Including Political Advertising of the Type Routinely Accepted by Publisher Plaintiffs.**

50.     The Act defines a "Qualifying Paid Digital Communication" as "any electronic communication that":

     a.   "is campaign material";

     b.   "is placed or promoted for a fee on an online platform";

     c.   "is disseminated to 500 or more individuals"; and

     d.   "does not propose a commercial transaction."

Md. Code, Elec. Law § 1-101(ll-1).

51.     The Act in turn defines "Campaign Material" as "any material that":

     a.   "contains text, graphics, or other images";

     b.   "relates to a candidate, a prospective candidate, or the approval or rejection of a [ballot] question or prospective [ballot] question;" and

       c.    "is published, distributed, or disseminated."

*Id.* § 1-101(k)(1)(i)-(iii).

52.     The Act further provides that "'Campaign material' includes:

     i.     a Qualifying Paid Digital Communication;

     ii.    any other material transmitted by or appearing on the Internet or electronic medium; and

     iii.   an oral commercial campaign advertisement."

*Id.* § 1-101(k)(2).

53.     Thus, the Act's definitions are circular: it defines a "Qualified Paid Digital Communication" as "campaign material" and defines "Campaign Material" to include "Qualified Paid Digital Communications."  Despite this, it also appears that the Act intended to define the two terms differently, with "Qualified Paid Digital Communications" constituting only paid advertisements (communications "placed or promoted for a fee") and "Campaign Materials" appearing to include both paid and unpaid communications (including "any . . . materials . . . appearing on the Internet").  It is impossible for on-line platforms who wish to host political speech, including Publisher Plaintiffs, to know what is and is not subject to regulation under the Act.

54.     The Act is vague and overbroad for additional reasons.  For example, the Act regulates all speech that "relates to" a "candidate, a prospective candidate, or the approval or rejection of a [ballot] question or prospective [ballot] question."  *Id.* § 1-101(k)(1)(i)-(iii).  Such a definition is both exceedingly broad and unclear as to its outer limits.

55.     Each of the Publisher Plaintiffs, including many of the smaller members of MDDC, accept political advertising about candidates, prospective candidates, ballot questions, prospective ballot questions, and issues that might be deemed to relate to one or more of those

topics.  Publisher Plaintiffs do so both to generate income to support their operations, but also to provide a forum for core speech about political candidates, ballot questions and issues.  Such a broad and amorphous definition is likely to chill core political speech about candidates and issues because the online platforms (as well as the speakers themselves) will be uncertain as to whether speech is included and will refrain from speech to steer clear of the statutory restrictions and regulations.

56.     By contrast, another section of the Act applicable directly to certain speakers uses a narrower definition.  Section 13-307 applies to electioneering communications, that are defined, *inter alia*, as a communication that "refers to a clearly identified candidate."  Md. Code, Elec. Law § 13-307(a)(3)(i).  Section 13-307(a)(3)(iii) provides that, "[f]or purposes of this paragraph, 'clearly identified' means:

> 1.   the name of a candidate appears;
>
> 2.   a photograph or drawing of a candidate appears; or
>
> 3.   the identity of a candidate or ballot issue is apparent by unambiguous reference.

Without expressing any views as to the constitutionality of this other section, the provisions of the Act applicable to websites like those of Publisher Plaintiffs could easily have used a narrower definition such as this, but did not do so.

### C.     Requirements Imposed on Publisher Plaintiffs

57.     Despite the substantial registration and reporting requirements already imposed on candidates and other political speakers themselves, described in detail in Part D below, the Act imposes a series of requirements on Publisher Plaintiffs and other conduits of electoral speech.

### 1.      Obligations Imposed to Publish Information

58.      An Online Platform must publish, at some "clearly identifiable location" on its

website, the information described in detail in the Act.  Md. Code, Elec. Law § 13-405(b)(1)-(3).

59.      The information must be published within 48 hours "after a qualifying paid digital

communication is purchased," must be machine readable and searchable, and must remain on the

website for at least one year after the general election.  *Id.*

60.      A purchaser shall be understood to have "purchased" a "qualifying paid digital

communication" for purposes of triggering that obligation if the requester "has executed a

contract to purchase a qualifying paid digital communication."  *Id.* § 13-405(b)(4).

61.      The following records must be published by the Online Platform, including that

they be made "available for public inspection on the Internet in a machine-readable format":

  i. For each qualifying paid digital communication for which the purchaser
     has provided the requisite notice that was "purchased by a political
     committee":

  1. The name of the person, and any contact information required by
     the state board, of the political committee;

  2. The identity of the treasurer of the political committee;

  3. The total amount paid by the purchaser for the placement of the
     qualifying paid digital communication.

  ii. For each qualifying paid digital communication for which the purchaser
      has provided the requisite notice that was "purchased by a person other
      than a political committee or an ad network":

  1. The name of the requester and any contact information required by
     the State Board of the requester;

  2. The identity of the individuals exercising direction or control over
     the requester, including the CEO or board of directors, if
     applicable; and

  3. The total amount paid by the requester to the Online Platform for
     the placement.

       iii.  For each qualifying paid digital communication for which the purchaser has provided the requisite notice that was "purchased by an ad network":

          1.  The contact information of the ad network; or

          2.  A hyperlink to the ad network's website where the contact information is located.

*Id.* § 13-405(b)(1)-(3) & (6)(i)-(iii).

### 2.     Obligations Imposed to Collect Information, and to Maintain and to Make Available Records

62.     Each Online Platform must "maintain and make available to the State Board on request" each the records described above.  Md. Code, Elec. Law § 13-405(c)(1).

63.     This obligation is triggered "within 48 hours after a qualifying paid digital communication" is first disseminated, and the records must be maintained and made available for at least one year after the general election to which the communication relates.  *Id.* § 13-405(c)(2).

64.     In addition, for each Qualifying Paid Digital Communication, an Online Platform must collect and maintain the following records:

       1.  The candidate or ballot issue to which the qualifying paid digital communication relates and whether the qualifying paid digital communication supports or opposes that candidate or ballot issue;

       2.  The dates and times that the qualifying paid digital communication was first and last disseminated;

       3.  A digital copy of the communication;

       4.  An approximate description of the geographic locations where the communication was disseminated;

       5.  An approximate description of the audience that received, or was targeted to receive, the communication; and

       6.  The total number of impressions generated by the communication.

*Id.* § 13-405(c)(3)(i)-(vi).

### 3.       Obligations Imposed to Cooperate with the Board

65.       Under the Act, Publisher Plaintiffs and all other Internet website operators are required to make "reasonable efforts to allow the State Board to":

1.   Obtain the information described above;

2.   Obtain the information provided to the Online Platform by the purchaser; and

3.   Request that the purchaser comply with its information-providing obligations.

Md. Code, Elec. Law § 13-405(e)(1)-(3).

66.       In addition, the Act purports to incorporate a federal statute, requiring Publisher Plaintiffs to comply with it, or to face state-law created enforcement mechanisms if they fail to do so.  Specifically, each Publisher Plaintiff is required to "make reasonable efforts, in accordance with the federal Stored Communications Act, to comply with any subpoena that is issued in connection with an investigation concerning the compliance of a purchaser" with the Act.  *Id.* § 13-405(f).

### 4.       Powers Conferred to Enforce the Act

67.       The Act empowers the Board to request that the Maryland Attorney General institute an action in a state Circuit Court for injunctive relief to:

i.   Require the purchaser to comply with the requirements of Sections 13-401 and 13-405 of the Election Law; or

ii.  Require the Online Platform to remove the qualified paid digital communication where the advertiser has not complied with those provisions.

Md. Code, Elec. Law § 13-405.1(b)(1)-(2).

68.       Failure to comply with an injunction is subject to penalties provided in "§ 13-605(b) of this Title," which provides that a "person who violates an injunction issued under this section: (1) is in criminal contempt; and (2) is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $250 or imprisonment not exceeding 30 days or both."

### 5.     No Non-U.S. Currency for Electioneering Communications

69.     Under Maryland Election Law § 13-405.2(c), "[a] person may not willfully and knowingly sell campaign material or an electioneering communication to a person who uses any currency other the United States Currency to pay for the campaign material of electioneering communication."

70.     When this issue was raised in committee hearings, with an example about an ad placed from Canada, the sponsor advised that it would be removed via amendment, but was not.

71.     Given the broad (and vague) definitions of "campaign material" and "electioneering communications" under the Act, this provision unduly burdens legitimate advertisements routinely placed by foreign governments and others, and clearly demarcated as such, addressing issues.  This type of speech adds to the political conversation citizens have about world affairs, and is impermissibly burdened by the Act.

### D.     Reporting and Disclosure Requirements Already Applicable Directly to Those Engaged in Paid Political Speech

72.     The various requirements imposed upon Publisher Plaintiffs and other Internet websites are entirely unnecessary to achieve the interest articulated by the sponsors of the legislation in attempting to justify the Act.  Not only is there no evidence of a newspaper or other website being unwittingly manipulated by illegitimate foreign political advertising, but the information Publisher Plaintiffs and other websites are now required to publish, collect, maintain and produce is already collected directly from speakers, who are required to provide it to the State Board of Elections.  The Board could easily publish that information on its own website, but is instead unconstitutionally compelling Publisher Plaintiffs to collect, maintain, publish and produce upon demand that information.

73.     For example, persons and organizations, including both candidate finance committees and others, that engage in "public communications" or "electioneering communications" are required to report certain information to the Board, under Maryland Election Law §§ 13-304(b)(1), 13-306, 13-307 & 13-309, two of which (Sections 13-306 & 13-307) were expanded under the Act to apply expressly to paid political speech on the Internet.

74.     Each of these sections requires that, at regular intervals, some as short as 48 hours, persons engaged in paid political speech must register and then report to the Board their expenditures.  *See* Md. Code, Elec. Law § 13-306 (governing "public communications," including on Internet websites, and requiring sponsors of such speech to register and report to the Board "(1) the identity of the person making the independent expenditures and of the person exercising direction or control over the activities of the person making the independent expenditures; (2) the business address of the person making the independent expenditures; (3) the amount and date of each independent expenditure during the period covered by the report and the person to whom the expenditure was made; (4) the candidate or ballot issue to which the independent expenditure relates and whether the independent expenditure supports or opposes that candidate or ballot issue; and (5) the identity of each person who made cumulative donations of $6,000 or more to the person making the independent expenditures during the period covered by the report"); *Id.* § 13-307 (imposing substantially identical requirements for "electioneering communications," including communications capable of being received by 5,000 people on Internet websites).

75.     Similarly, Code of Maryland Regulations ("COMAR") § 33.13.02.02, which was promulgated to implement Md. Code, Elec. Law § 13-304(b)(1), requires campaign committees to report to the Board:

    (1) The date the expenditure was made;

    (2) The method of the expenditure transaction including any information on the transaction method required by the State Administrator;

    (3) The name and address of the payee or the ultimate recipient of the campaign funds;

    (4) If the expenditure was for reimbursement, the name and address of the campaign worker who received the reimbursement;

    (5) The amount of the expenditure;

    (6) A description of the expenditure, including whether the expenditure was for a paid campaign advertisement;

    (7) If the expenditure was an in-kind contribution, the name of the campaign finance entity receiving the in-kind contribution; and

    (8) If the expenditure was to a person to engage in online advocacy on behalf of the political committee, the name and Internet address of any social media identifier, online website, web log, blog, or microblog used by that person.

    76.    The fact that the Election Law already imposes detailed reporting requirements on speakers engaged in political speech/advertising, and the fact that the Board could easily publish that information itself, further demonstrates the unconstitutionality of additional reporting and publishing requirements imposed upon Publisher Plaintiffs.

    77.    In addition to the foregoing registration and expenditure reports, the Election Law also requires political advertisers to include certain disclosures in the on-line campaign materials they submit for publication.  Specifically, Maryland Election Law § 13-401(a) provides that "campaign material shall contain . . . an authority line that states" (a) a campaign entity, as well as the name and address of its treasurer, if published by a campaign finance entity, (b) the name and address of the person responsible, if published by any other person, or (c) a specific statement, if published in opposition to a candidate, but not authorized by a candidate.

78.     Given all of these other requirements imposed directly on political speakers engaged in Internet (and other) political advertising, the provisions of the Act applicable to Publisher Plaintiffs and other websites are duplicative and therefore, by definition, not narrowly tailored to serve the asserted interest.  Indeed, these other provisions of the Election Code constitute less restrictive alternatives, alternatives that render the challenged provisions of the Act unconstitutional on their face.

### E.     Burden on Publisher Plaintiffs

79.     The challenged provisions of the Act impose a substantial – and unnecessary – burden on Publisher Plaintiffs.  The Publisher Plaintiffs believe that the State's requirement that they engage in compelled speech violates the very independence to which they are entitled under the First Amendment.  In many instances, the information required to be published, collected, maintained and/or produced is not something that is collected or stored in a manner that is easy to assemble without substantial burden.  In many cases, it is not information that is collected at all and would require the purchase and implementation of expensive analytics software to capture.

80.     Each of the Publisher Plaintiffs is currently evaluating whether they have sufficient resources to devote to compliance.  The Act requires each publisher to choose between enduring a substantial burden or ultimately determining that it cannot accept political advertising because the burden is too onerous.  Despite its substantial resources, and its significant presence in the market for digital on-line advertising, Google has announced that, because of the Act, it will no longer accept political advertising in Maryland.

81.     If Publisher Plaintiffs are forced to make a similar choice, this will work both a financial injury on the Publisher Plaintiffs and will also substantially curtail the speech available

to the citizens of Maryland, as is already the case from the choice Google has made.  Particularly
at a time when legitimate political debate is crucial, and when newspapers throughout the State
are financially challenged by a changing media landscape, this is a burden that neither Publisher
Plaintiffs nor the public can afford to accept.  And it is one that, given the other regulations
directly applicable to political speakers and advertisers, is ultimately both unnecessary and
unconstitutional.

82.     Other states have enacted statutes with similar goals, but none of them sweeps so
broadly or imposes such onerous (and unconstitutional) requirements on local news sources such
as the Publisher Plaintiffs.  For example, although Washington State has recently amended a
longstanding law regarding transparency in political advertising to apply to online
advertisements, it applies to a narrower and far more precisely defined class of information and
does not require affirmative publication of information.  Similarly, proposed regulations
implementing New York's recently passed Democracy Protection Act appropriately tailor the
law such that it applies only to online advertisers with 70 million or more monthly visitors (i.e.,
major platforms like Google, Facebook, and the like) and expressly exempts newspaper websites
from the definition of platforms to which the law applies.[5]  Moreover, neither state authorizes the
type of "prior restraint" remedy available under the Maryland Act.

83.     In light of the foregoing, and as anticipated by the Governor, the Publisher
Plaintiffs bring this action to declare that (a) the statute is unconstitutional under the First,
Fourth, and Fourteenth Amendments to the United States Constitution and (b) it is preempted by
the Communications Decency Act, 47 U.S.C. § 230.  Publisher Plaintiffs seek a preliminary and

---

[5] *See* 9 NYCRR §§ 6200.10, 6200.11, *available at* https://www.elections.ny.gov/
NYSBOE/download/law/EmergencyAdoptionAndNoticeofRevisedRulemakingof
9NYCRRsubtitleVpart620010and620011.pdf.

permanent injunction enjoining Defendants and their agents from enforcing Sections 13-405, 13-405.1 and 13-405.2 of the Act, as well as the definitions included in Section 1-101 that are incorporated by reference into those sections.

## COUNT I:

## VIOLATION OF THE FIRST, FOURTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

84.     The Publisher Plaintiffs incorporate by reference Paragraphs 1-83 above as if fully set forth herein.

85.     Section 13-405, 13-405.1 and 13-405.2, as well as the definitions included in Section 1-101 incorporated by reference into those sections, are unconstitutional under the First, Fourth and Fourteenth Amendments to the United States Constitution for many reasons, each of which is sufficient – both independently and especially in combination – to invalidate those provisions Act, including without limitation that:

   a.   The Act unconstitutionally compels speech by the Publisher Plaintiffs.

   b.   The Act substantially burdens core political speech and fails to withstand strict scrutiny, because the challenged provisions are not necessary to serve a compelling governmental interest articulated by the State, are not narrowly tailored to achieve that interest, and far from the least restrictive means of achieving that interest, including without limitation because the State already collects substantial information from speakers, could collect the rest directly, and could publish it, if it so chooses.  Alternatively, the Act is unconstitutional because it does not directly and materially advance the State's claimed interest and it burdens far more speech than is necessary to serve that interest.

c. The provisions of the Act are both vague and overbroad, and subject Publisher Plaintiffs to punishment without due process of law.

d. The Act authorizes a court to enjoin Publisher Plaintiffs from publishing political advertisements, which violates the bedrock principle prohibiting prior restraints.

e. The Act authorizes the Board to seize records of the Publisher Plaintiffs, which are entitled to special protection under the Fourth Amendment's protection for "papers."

86. As a result of these substantial constitutional infirmities, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, the Publisher Plaintiffs seek a declaration that the challenged provisions of the Act are unconstitutional and both a preliminary and permanent injunction enjoining Defendants and their agents from enforcing those provisions.

## COUNT II:

### VIOLATION OF SECTION 230 OF THE COMMUNICATIONS DECENCY ACT OF 1996, 47 U.S.C. § 230

87. The Publisher Plaintiffs incorporate by reference Paragraphs 1-86 above as if fully set forth herein.

88. Each of the Publisher Plaintiffs' websites is an "interactive computer service" as defined by Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230").

89. Section 230 allocates the respective rights and burdens between third party content providers and services, like the websites of Publisher Plaintiffs, that host such content, and pre-empts contrary state law.

90. The Act violates the Publisher Plaintiffs' rights under 47 U.S.C. § 230(c)(1), because it purports to re-allocate those rights and burdens, imposing substantial additional burdens on Publisher Plaintiffs.

91.     As a result, the Act is a "State . . . law that is inconsistent with" Section 230, in violation of Section 230(e)(3), and should therefore be declared invalid and enjoined from enforcement.

92.     As a result of these violations of federal law, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, the Publisher Plaintiffs seek a declaration that the challenged provisions of the Act violate Section 230 of the Communications Decency Act of 1996, and both a preliminary and permanent injunction enjoining Defendants and their agents from enforcing those provisions.

**PRAYER FOR RELIEF**

WHEREFORE, the Publisher Plaintiffs respectfully request that this Honorable Court:

1.  Declare that Section 13-405, 13-405.1 and 13-405.2 of the Act, as well as the definitions included in Section 1-101 incorporated by reference into those sections, are unconstitutional under the First, Fourth and Fourteenth Amendments to the United States Constitution;

2.  Declare that Section 13-405, 13-405.1 and 13-405.2 of the Act, as well as the definitions included in Section 1-101 incorporated by reference into those sections, are invalid and preempted under Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230;

3.  Enter a preliminary injunction enjoining Defendants and their agents from enforcing Section 13-405, 13-405.1 and 13-405.2 of the Act, as well as the provisions of Section 1-101 incorporated by reference into those sections;

4.      Enter a permanent injunction enjoining Defendants and their agents from

enforcing Section 13-405, 13-405.1 and 13-405.2 of the Act, as well as the

provisions of Section 1-101 incorporated by reference into those sections;

5.      Award Publisher Plaintiffs their reasonable attorneys' fees and costs of this action

pursuant to 42 U.S.C. § 1988; and

6.      Grant Publisher Plaintiffs such other relief as the Court deems just and proper.


Dated: August 17, 2018

Respectfully submitted,

BALLARD SPAHR LLP


By: */s/Seth D. Berlin*
    Seth D. Berlin (Bar No. 12617)
    Paul J. Safier (*pro hac vice* motion to be filed)
    Dana R. Green (*pro hac vice* motion to be filed)

1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: 202.661.2200
Facsimile: 202.661.2299
berlins@ballardspahr.com
safierp@ballardspahr.com
greend@ballardspahr.com

*Attorneys for Plaintiffs*