IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THE WASHINGTON POST, *et al.*

                    Plaintiffs,

        v.

DAVID J. McMANUS, JR., Chairman, Maryland
State Board of Elections, in his official capacity,
*et al.*

                    Defendants.

Civil Action No. 1:18-cv-02527-DKC

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Seth D. Berlin (Bar No. 12617)
Paul J. Safier (*pro hac vice* motion to be filed)
Dana R. Green (*pro hac vice* motion to be filed)
BALLARD SPAHR LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: 202.661.2200
Facsimile: 202.661.2299
berlins@ballardspahr.com
safierp@ballardspahr.com
greend@ballardspahr.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................................... 2

A.     The Parties ......................................................................................................................... 2

B.     The Act .............................................................................................................................. 4

       1.     Legislative History of the Act ................................................................................. 4

       2.     The Challenged Provisions of the Act .................................................................. 8

       3.     These Provisions Are Duplicative of Reporting and Disclosure Requirements Already Applicable Directly to Those Engaged in Paid Political Speech ........... 11

C.     The Harm to the Publisher Plaintiffs ........................................................................... 12

ARGUMENT ............................................................................................................................... 13

I.     The Publisher Plaintiffs Are Likely To Succeed On The Merits Of Their Challenge To The Act ................................................................................................... 14

       A.     The Act Is Unconstitutional Under The First, Fourth, And Fourteenth Amendments .................................................................................... 14

              1.     The Act Compels Speech In Violation Of The First Amendment ............................................................................................ 14

              2.     The Act Cannot Withstand Strict Scrutiny ................................................. 17

              3.     The Act Is Unconstitutionally Vague ......................................................... 23

              4.     The Act Authorizes Unconstitutional Injunctions Against Speech .......................................................................................... 25

              5.     The Act Authorizes Unconstitutional Seizures of "Papers" ..................... 27

       B.     The Act Is Preempted By Section 230 of the Communications Decency Act ....................................................................................................... 28

II.    Publisher Plaintiffs Also Satisfy Each of the Other Factors Warranting Preliminary Injunctive Relief ...................................................................................... 30

CONCLUSION ........................................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Humanist Association v. Maryland-National Capital Park & Planning
Commission*,
874 F.3d 195 (4th Cir. 2017) ...................................................................................................3

*Aschcroft v. ACLU*,
542 U.S. 656 (2004)................................................................................................................22

*Baldino's Lock & Key Service, Inc. v. Google, Inc.*,
88 F. Supp. 3d 543 (E.D. Va. 2015) ................................................................................29, 30

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)............................................................................................................26, 28

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)................................................................................................................27

*Bolger v. Youngs Drug Products Corp.*,
463 U.S. 60 (1983)..................................................................................................................16

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011)...................................................................................................18, 20, 26

*Cahaly v. Larosa*,
796 F.3d 399 (4th Cir. 2015) ............................................................................................17, 18

*Citizens United v. FEC*,
558 U.S. 310 (2010)...........................................................................................................14, 17

*City of Los Angeles v. Patel*,
135 S. Ct. 2443 (2015)......................................................................................................27, 28

*Collins v. Purdue University*,
703 F. Supp. 2d 862 (N.D. Ind. 2010) ...................................................................................29

*Doe v. Backpage.com, LLC*,
817 F.3d 12 (1st Cir. 2016)....................................................................................................30

*Doe v. Cooper*,
842 F.3d 833 (4th Cir. 2016) .................................................................................................23

*Doe v. Pittsylvania County, Va.*,
842 F. Supp. 2d 927 (W.D. Va. 2012) ...................................................................................32

*FCC v. Pacifica Foundation*,
  438 U.S. 726 (1978)..................................................................................17

*Free Speech Coalition, Inc. v. Attorney General*,
  825 F.3d 149 (3d Cir. 2016)....................................................................27

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ............................................................31, 32

*Goddard v. Google, Inc.*,
  640 F. Supp. 2d 1193 (N.D. Cal. 2009) ..................................................30

*Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor & City Council
  of Baltimore*,
  879 F.3d 101 (4th Cir. 2018) ....................................................15, 18, 22

*Hadley v. Gatehouse Media Freeport Holdings, Inc.*,
  2012 WL 2866463 (N.D. Ill. July 10, 2012)............................................29

*Hassay v. Mayor & City Council of Ocean City, Md.*,
  955 F. Supp. 2d 505 (D. Md. 2013).........................................................32

*Hassel v. Bird*,
  420 P.3d 776 (Cal. 2018) .........................................................................30

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
  174 F.3d 411 (4th Cir. 1999) ...................................................................32

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
  515 U.S. 557 (1995)...........................................................................14, 16

*Legend Night Club v. Miller*,
  637 F.3d 291 (4th Cir. 2011) .............................................................31, 32

*Marcus v. Search Warrants of Property at 104 E. Tenth St.*,
  367 U.S. 717 (1961)..................................................................................28

*McDonald v. LG Electronics USA, Inc.*,
  219 F. Supp. 3d 533 (D. Md. 2016)..........................................................29

*Miami Herald Publishing Co. v. Tornillo*,
  418 U.S. 241 (1974)...........................................................................15, 16

*Nebraska Press Association v. Stuart*,
  427 U.S. 539 (1976)..................................................................................26

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ...................................................................29

iii

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ........................................................................................14

*Newsom v. Albemarle County School Board*,
    354 F.3d 249 (4th Cir. 2003) .....................................................................31, 32

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ..........................................................................32

*Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*,
    413 U.S. 376 (1973)........................................................................................26

*Planned Parenthood of Central North Carolina v. Cansler*,
    804 F. Supp. 2d 482 (M.D.N.C. 2011) .............................................................32

*Red Lion Broadcasting Co. v. FCC*,
    395 U.S. 367 (1969)........................................................................................17

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015)................................................................................17, 18

*Reno v. ACLU*,
    521 U.S. 844 (1997)....................................................................................17, 25

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988)....................................................................................15, 16

*Rossignol v. Voorhar*,
    316 F.3d 516 (4th Cir. 2003) ...........................................................................31

*Snyder v. Phelps*,
    562 U.S. 443 (2011)........................................................................................14

*United Seniors Association v. Social Security Administration*,
    423 F.3d 397 (4th Cir. 2005) ...........................................................................23

*United States v. Alvarez*,
    567 U.S. 709 (2012)..............................................................................18, 19, 26

*United States v. Stevens*,
    559 U.S. 460 (2010)........................................................................................26

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................14

*Wooley v. Maynard*,
    430 U.S. 705 (1977)........................................................................................14

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ............................................................................................16

*Zeran v. America Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) .......................................................................29, 30

**Statutes**

9 NYCRR §§ 6200.10, 6200.11 ...................................................................................21

47 U.S.C. § 230 ..............................................................................................2, 28, 29

Maryland Code, Election Law § 13-306 .......................................................................12

Maryland Code, Election Law § 13-307 .......................................................................12

Maryland Code, Election Law § 1-101 .................................................................... *passim*

Maryland Code, Election Law § 2-102 ..........................................................................4

Maryland Code, Election Law § 13-401 .......................................................................12

Maryland Code, Election Law § 13-405 ................................................................. *passim*

Maryland Code, Election Law § 13-405.1 ............................................................... *passim*

Maryland Code, Election Law § 13-405.2 ................................................................11, 22

Maryland Code. Election Law § 13-605 .......................................................................11

New York Election Law § 14-107 ................................................................................21

Washington Revised Code § 42.17A.005(39) ................................................................21

**Other Authorities**

COMAR § 33.13.02.02 ...............................................................................................12

Federal Rule of Civil Procedure 65 ..............................................................................2

Maryland Constitution Article II, § 17(c) .......................................................................6

Maryland Constitution Article V, § 3 ............................................................................4

**PRELIMINARY STATEMENT**

The plaintiffs in this proceeding are newspaper publishers, who publish affiliated websites, and an organization that represents newspapers throughout Maryland (collectively, the "Publishers Plaintiffs").  Together, they are challenging multiple provisions of a newly enacted Maryland statute, the Online Electioneering Transparency and Accountability Act, Md. Code, Elec. Law §§ 13-405, 13-405.1 and 13-405.2, as well as the definitions included in § 1-101 that are incorporated therein (the "Act").[1]  Though the purpose of the Act is to combat the foreign – and, in particular, *Russian* – use of social media to influence Maryland elections, it does so in part by going after online newspapers that host digital political ads, subjecting them to burdensome and intrusive publication, record-keeping, and reporting obligations.  Specifically, the Act requires that, for every "political" digital ad an online publisher accepts, the publisher must (a) within 48 hours of the purchase of the ad, publish on its website information about the ad and its sponsor, including proprietary information about the pricing of the ad, and (b) within 48 hours of the posting of the ad, assemble multiple categories of information about the ad and its sponsor, much of which publishers do not already track as a matter of course, and then make that information automatically available upon request to the State Board of Elections.  In addition, the Act empowers Maryland Circuit Courts to issue injunctions requiring removal of political ads upon a finding of non-compliance with the Act.

---

[1] As used here and throughout, the term "Act" refers only to those provisions of the legislation that the Publisher Plaintiffs are challenging – *i.e.*, those provisions that regulate the conduct of, and place burdens on, online publishers.  A copy of the Chaptered version of the Act as enacted is attached as Exhibit A to the Declaration of Seth D. Berlin.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Publisher Plaintiffs respectfully move this Court for a preliminary injunction prohibiting enforcement of the Act. As set forth in detail below, the Act is unconstitutional because it:

1.  compels speech by online publishers based on the government's assessment of what information Maryland readers need to know, in violation of the First Amendment;

2.  cannot withstand strict scrutiny, applicable under the First Amendment to such content-based restrictions of speech, because it burdens both substantially more speech and substantially more speakers than is necessary to pursue the aims of the Act;

3.  subjects publishers to a series of confusing and vague requirements in violation of the First and Fourteenth Amendments, thus encouraging publishers simply to abandon the field of political ads, rather than subject themselves to an impossible-to-comply-with regulatory scheme;

4.  authorizes injunctions compelling the removal of online content without any adjudication as to whether the speech at issue is protected, thereby violating the bedrock First Amendment principle prohibiting prior restraints; and

5.  requires online publishers to turn over records to the government without any showing of need or access to judicial or quasi-judicial process, in violation of the Fourth Amendment.

In addition, the Act is preempted by Section 230 of the Communications Decency Act of 1996, 47 U.S.C § 230, which bars states from imposing liability on online publishers based on third-party content they host, including the political advertising subject to the Act. For these reasons, and because the Act works an immediate and irreparable harm to Publisher Plaintiffs' constitutional rights, a preliminary injunction barring enforcement of the Act is warranted.

## FACTUAL BACKGROUND

### A.    The Parties

The Publisher Plaintiffs are a coalition of newspaper publishers that publish in Maryland, including online on each of their respective Internet websites, and one organization – the Maryland-Delaware-D.C. Press Association (the "MDDC") – that represents most of the

2

newspapers in Maryland.[2]  Though the plaintiffs range from publishers of large newspapers like *The Washington Post* and *The Baltimore Sun* to publishers of smaller newspapers throughout every region of the state, declarations filed on behalf of each of the newspaper plaintiffs confirm that they are subject to the Act because each operates a website that has more than 100,000 monthly visitors or users.[3]  As for the MDDC, it represents the interests of its members, including those that operate websites that currently do not have 100,000 or more monthly visitors or users, but which are likely to in the future, especially as readers of traditional newspapers increasingly move away from print in favor of news websites.  *See* Decl. of Rebecca Snyder ¶ 7.

Each of the Publisher Plaintiffs, including many of the smaller members of MDDC, accepts political advertising about candidates, prospective candidates, ballot questions, prospective ballot questions, and issues that might be deemed to relate to one or more of those topics.  The Publisher Plaintiffs do so both to generate income to support their operations, but also to provide a forum for core speech about political candidates, ballot questions and issues.

---

[2] The MDDC has standing to participate in this lawsuit on behalf of its members because (a) its individual members, as organizations regulated by the Act, would have standing to sue on their own, (b) the MDDC's mission is to advance the interests of its members, as it is doing through this litigation and as it previously did in lobbying against passage of the Act, and (c) neither the claims asserted, nor the non-monetary relief requested, requires participation of all of the MDDC's individual members.  *See Am. Humanist Assoc. v. Maryland-National Capital Park & Planning Comm'n*, 874 F.3d 195, 203-04 (4th Cir. 2017) ("An association has standing to sue on behalf of its members if they would have standing to sue on their own, the association seeks to protect interests germane to its purpose, and neither the claim asserted nor the relief requested requires its individual members to participate in the lawsuit.") (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

[3] In connection with their motion, the Publisher Plaintiffs are submitting declarations from representatives of each of the newspapers participating in this proceeding, as well as from MDDC.  In particular, in addition to a declaration from undersigned counsel submitting two documents, the Publisher Plaintiffs are filing declarations from the following persons on behalf of the following publications: Kate Davey (*The Washington Post*), Timothy J. Thomas (*The Baltimore Sun*, *The Capital*, *Carroll County Times*), David Fike (*The Star Democrat*, *Cecil Whig*, and *Maryland Independent*), Robin Quillon (*Cumberland Times-News*), Geordie Wilson (*The Frederick News-Post*), Andrew Bruns (*The Herald-Mail*), and Rebecca Snyder (all members of the Maryland-Delaware-D.C. Press Association) (collectively, the "Declarations").

The Defendants are Maryland state officials responsible for the implementation and enforcement of the Act, each of whom is being sued in his or her official capacity.  In particular, David J. McManus, Patrick J. Hogan, Michael R. Cogan, Kelly A. Howells, and Malcolm L. Funn are the five current members of the Maryland State Board of Elections (the "Board").  The Board is generally charged with the management and supervision of elections in Maryland, as well as ensuring compliance with the Maryland Election Law.  Md. Code, Elec. Law § 2-102.  Linda H. Lamone is the Maryland State Administrator of Elections, which is the office empowered under the Act to conduct investigations into potential violations of Sections 13-401 and 13-405 of the Act.  *See id.* § 13-405.1.  Finally, Brian E. Frosh is the Attorney General of Maryland, and is responsible for the enforcement of the laws of Maryland generally and of the Act in particular.  *See*, Md. Const. art. V, § 3; Md. Code, Elec. Law § 13-405.1(b)(1).

**B.**     **The Act**

**1.**     **Legislative History of the Act**

The bill that was ultimately enacted into the law at issue, House Bill 981, was introduced and sponsored in the Maryland House by Delegates Alonzo Washington, Marc Korman and Samuel "Sandy" Rosenberg on February 5, 2018.  On the same date, the companion bill, Senate Bill 875, was introduced in the Senate by Senator Craig Zucker.  The committee hearings and comments on the floor of the Maryland House and Senate make two things clear about the impetus behind the bill: (1) its sponsors were chiefly concerned about the use of digital political communications, both paid and unpaid, by Russia to influence elections in the United States, and (2) its sponsors understood that problem to be one affecting large social-media and search-engine platforms like Facebook, Twitter and Google.

On February 20, 2018, the Ways and Means Committee of the House of Delegates held a

hearing on the bill.  In his introductory remarks, Delegate Alonzo Washington described his bill:

> This legislation seeks to provide greater transparency and accountability for
> online political advertisements.  The legislation . . . . requires online platforms
> such as Facebook, Twitter, Google, uh and Google, that publish political online
> ads to retain a digital copy of the ad and maintain a public database of the name
> and address of the person who purchased the ad and the cost of the ad and [it]
> requires an online platform, online platforms to provide a digital copy of an online
> ad and the cost of the ad to the state Board of Elections within 48 hours after an
> ad is purchased by a foreign principal.  According to a recent study of the 2016
> election . . . it appears that Russia-linked accounts purchased political ads on
> nearly every major online platform.  Facebook found ad buys totaling $150,000
> linked to fake accounts suspected to be controlled by Russians, estimated that the
> Russia-linked ads were seen by at least 10 million people.  Twitter found accounts
> controlled by the Kremlin-linked network, RT, spent about $274,000 on ads in
> 2016.  This bill is made to make sure these types of acts do not happen here in the
> state of Maryland.[4]

At the hearing, Delegate Rosenberg also offered testimony explaining that the purpose of the

legislation was to combat foreign election interference and asserting that:

> . . . our fundamental process of electing candidates to public office is now at risk
> and just indictments don't matter thus far because since the indictments handed
> down by the Justice Department on Friday we see even just after the shooting in
> . . . Parkland, . . . the Russian bots are at work.  So, what this legislation would do,
> similar to the bill you just heard before, is to build upon our existing structure.
> For instance, to add on-line advertising to the existing definitions of campaign
> material, public communication, and electioneering communication to impose the
> same requirements that we already do on non-digital communications dealing
> with Maryland candidates in Maryland elections. . . .
>
> We're talking about sustained, systemic efforts to upset, diminish, destroy our
> fundamental system and I would hope, and I know, feel confident that the
> committee, as it has in the past, will take the appropriate action on my bill and/or
> on the bill you heard prior to this.[5]

---

[4] *Available at*: http://mgahouse.maryland.gov/mga/play/eb5126c2-5f0b-4512-a03c-c37ce18e159c/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (0:06:31 - 0:08:33).

[5] *Available at*: http://www.delsandy.com/category/sandys-2018-legislative-diary/page/3/.

Delegate Rosenberg later described the bill in his 2018 Session Summary for constituents as "our first-in-the nation response to the Kremlin's disruption campaign during the 2016 election."[6]

On March 1, 2018, the Senate Education, Health, and Environmental Affairs Committee held a hearing on Senate Bill 875.  Senator Zucker, the Senate bill's sponsor, once again emphasized concerns about ads appearing on Facebook:

> So we've heard, we've heard a lot about interference from other countries when it comes to ads and this legislation is a first attempt to sort of unveil the iron curtain and see exactly what the face is behind who may be placing some of these fraudulent ads.  I wanted the committee to know that we've been working with stake-holders like Facebook to make sure that we're taking appropriate action and also being a national leader on this.  And I believe that this legislation ultimately will be a national model. . . .  I will just very quickly go over the intent of the bill. The intent of the bill is, one, is to make sure that if there's any ads being put on what would be social media, it actually has to be done in US currency, right?  We don't want rubles buying ads in the United States for elections.  And the other piece of it is, is we also want to make sure—and this is something that Facebook would work on—is keeping a database of those folks that actually purchase the ads.[7]

As far as the Publisher Plaintiffs are aware, throughout the entire legislative history of the bill, there was not a single concern expressed about, or evidence tendered regarding, any efforts to place deceptive foreign advertising on any newspaper's website or on any platform other than Facebook, Google or Twitter.

On May 26, 2018, Online Electioneering Transparency and Accountability Act became law, with an effective date of July 1, 2018.  Maryland Governor Larry Hogan did not sign the legislation, but allowed it to become law, pursuant to Article II, § 17(c) of the Maryland Constitution.[8]  The day before the bill became law, Governor Hogan announced in

---

[6] *Available at*: http://www.delsandy.com/2018-session-summary/.

[7] *Available at*: http://mgahouse.maryland.gov/mga/play/0f183b99-dfef-4eb4-8dbe-b1f6369a3d56/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c (1:28:00-1:30:06).

[8] Article II, § 17(c) of the Maryland Constitution provides that "[a]ny Bill presented to the Governor within six days (Sundays excepted), prior to adjournment of any session of the

correspondence to the President of the Maryland Senate and the Speaker of the Maryland House

of Delegates that he was allowing the bill to become law without his signature.  After praising

certain "laudable goals" underlying the statute, Governor Hogan explained that he was "not

signing the legislation in light of serious constitutional concerns that have been expressed

regarding the bill."  Berlin Decl. Ex. B.  His official statement continued:

> Most disconcerting to me is the request for a veto that I have received from the
> Maryland-Delaware-D.C. Press Association, which represents all of the daily
> newspapers in our state.  The free press is a cornerstone of our republic, and the
> press corps' concern that this legislation would compel speech by news outlets is
> a precedent I am deeply concerned about establishing.  I am cognizant that there
> are opposing views on this issue, but I cannot sign a piece of legislation that could
> allow the government to coerce news outlets protected by the First Amendment to
> publish certain material.  A number of alternative approaches were recommended
> – yet unfortunately rejected – that would have achieved the same ends of this bill
> while ensuring the freedom of the press enshrined in the Constitution remains
> intact.

*Id.*  Governor Hogan's official statement also addressed the vagueness and overbreadth of the

Act:

> Similarly, I am concerned that the legislation contains vague and overbroad
> language that could have the unintended consequence of stifling the free speech of
> citizens who are mobilizing on social media platforms.  Stipulating that online
> materials that 'relate' to any candidate or prospective candidate [or ballot question
> or prospective ballot question] are subject to disclosure and regulation by the
> State Board of Elections casts a very wide net and I am concerned that groups that
> are simply exercising their constitutional rights of free speech will unsuspectingly
> be subject to regulation and possible criminal penalties for merely expressing a
> political opinion.  The legislature could have more carefully drawn a distinction
> between clear campaign activity versus protected political speech that shouldn't
> be stifled by the fear of governmental regulation.  The constitutional strict
> scrutiny of restrictions of political speech demands a more careful and precise
> demarcation of what is subject to regulation and for what purpose.

*Id.*  The Governor concluded by acknowledging that he fully "expect[s]" that there "will be a

constitutional challenge on these grounds."  *Id.*

---

General Assembly, or after such adjournment, shall become law without the Governor's
signature unless it is vetoed by the Governor within 30 days after its presentment."

2.        **The Challenged Provisions of the Act**

A more complete account of the Act and the regulatory scheme it puts in place is set forth

in the Complaint.  *See* Compl. ¶¶ 1-83.  Put in general terms, the Act imposes a series of

publication, record-keeping, and reporting obligations on online publishers that accept political

advertisements.  In addition, the Act empowers the Maryland Attorney General to seek removal

of advertisements where the relevant obligations are not being fulfilled.

By its terms, the Act applies to any "Online Platform," defined as "any public-facing

website, web application, or digital application, including a social network, ad network, or search

engine, that" has "100,000 or more unique monthly visitors or users" and that "receives

payment" for "qualifying paid digital communications," which is the principal form of speech

the Act regulates.  Md. Code, Elec. Law § 1-101(dd-1).  The Act defines a "Qualified Paid

Digital Communication" in two steps.  First, the Act defines a "Qualifying Paid Digital

Communication" as "any electronic communication that":

> 1. is campaign material;
>
> 2. is placed or promoted for a fee on an online platform;
>
> 3. is disseminated to 500 or more individuals; and
>
> 4. does not propose a commercial transaction.

*Id.* § 1-101(ll-1).  Second, the Act defines "Campaign Material" as "any material that":

> 1. contains text, graphics, or other images;
>
> 2. relates to a candidate, a prospective candidate, or the approval or rejection of a [ballot] question or prospective [ballot] question; and
>
> 3. is published, distributed, or disseminated.

*Id.* § 1-101(k)(1)(i)-(iii).  Crucially, no clarification is offered by the statute as to what exactly it

means for an issue advertisement to "relate[] to" an candidate or question – or prospective

candidate or question – in the manner that triggers obligations under the Act.  Moreover,

"Campaign material" is further defined to include "qualifying paid digital communication[s],"

*Id.* § 1-101(k)(2), such that the two terms are circularly defined by referring to one another.

Despite this legislatively created confusion, once an ad purchaser makes a purchase with an

online publisher, and provides notice to the online publisher that the purchased ad is a

"Qualifying Paid Digital Communication" as defined by the Act, a series of obligations on the

part of the publisher is triggered.  *Id.* § 13-405(a)(1)-(2).

First, the placement of such an ad triggers an obligation to publish certain content.

Specifically, it requires the publisher to publish, at some "clearly identifiable location" on its

website, certain information about the ad and its purchaser, as described more fully below.  *Id.*

§ 13-405(b)(1)-(3).  That information must be published "within 48 hours after a qualifying paid

digital communication is purchased," be machine readable and searchable, and stay on the

website for at least one year after the relevant general election.  *Id.*  Under the Act, a purchaser

shall be understood to have "purchased" a "qualifying paid digital communication" if it "has

executed a contract to purchase a qualifying paid digital communication."  *Id.* § 13-405(b)(4).

The specific records that a publisher must publish depend, in part, on who purchased the ad.  For

ads purchased by "a political committee," or by a person or entity other than a "political

committee or an ad network," the publisher must publish information relating to (1) the identity

of the ad purchaser and its chief decisionmakers, and (2) the total amount paid to the publisher

for placement of the ad.  *Id.* § 13-405(b)(6)(i)-(ii).  As set forth in the accompanying

Declarations, many publishers deem the amount paid for digital advertising as proprietary and

not something they would voluntarily publish on their websites.[9]

Second, the purchase of a qualifying ad triggers multiple obligations to maintain various records – many of which are not routinely kept – and to make them available to state authorities on demand.  Specifically, for each qualifying paid digital communication, the Online Platform must maintain the following records:

> 1. The candidate or ballot issue to which the qualifying paid digital communication relates and whether the qualifying paid digital communication supports or opposes that candidate or ballot issue;
>
> 2. The dates and times that the qualifying paid digital communication was first and last disseminated;
>
> 3. A digital copy of the communication;
>
> 4. An approximate description of the geographic locations where the communication was disseminated;
>
> 5. An approximate description of the audience that received, or was targeted to receive, the communication; and
>
> 6. The total number of impressions generated by the communication.

*Id.* § 13-405(c)(3)(i)-(vi).  These records must be made "available on the request" of the Board "within 48 hours after a qualifying paid digital communication is first disseminated."  *Id.* § 13-405(c)(2).  As set forth in the accompanying Publisher Declarations, these are, for the most part, not records that online publishers collect and collate in the normal course of business.  Thus, complying with this portion of the Act will require publishers to divert resources from their normal activities, especially in order to comply with the tight deadlines imposed by the Act.

The Act also authorizes actions for injunctive relief against publishers.  The Act empowers the Board, upon a determination that the Act's requirements are not being met with

---

[9] For ads purchased through a third-party "ad network," the publisher need only publish either (1) contact information for the ad network, or (2) a hyperlink to where such information is located.  *Id.* § 13-405(b)(6)(iii).

10

respect to any particular "qualified paid digital communication," to request that the Maryland

Attorney General institute an action for injunctive relief either to require the purchaser to comply

with its obligations, *or to require the online publisher to remove the advertisement. Id.* § 13-

405.1(b)(1)-(2).  The Act specifies that failure to comply with an injunction is subject to the

penalties set out in "§ 13-605(b) of this Title," which provides that a "person who violates an

injunction issued under this section: (1) is in criminal contempt; and (2) is guilty of a

misdemeanor and on conviction is subject to a fine not exceeding $ 250 or imprisonment not

exceeding 30 days or both."  *Id.* § 13-405.1(b)(4) (citing Md. Code. Elec. Law § 13-605(b)).

Finally, the Act bars online publishers from accepting any payment other than U.S. currency for

political advertisements.  *Id.* § 13-405.2(c).

### 3. These Provisions Are Duplicative of Reporting and Disclosure Requirements Already Applicable Directly to Those Engaged in Paid Political Speech

These obligations imposed on online publishers were enacted against the backdrop of

separate disclosure and reporting requirements already imposed under Maryland law on

purchasers of political ads, whose conduct is the actual focus of the Act.

For example, persons and organizations, including both candidate finance committees

and others, that engage in "public communications" or "electioneering communications" are

required to report certain information to the Board, under Maryland Election Law

§§ 13-304(b)(1), 13-306, 13-307 and 13-309.  Two of those code sections – Sections 13-306 and

13-307 – were expanded under the Act to apply to digital political advertising.  Each of these

sections requires that, at regular intervals, some as short as 48 hours, persons engaged in paid

political speech must register and then report to the Board their expenditures.  Section 13-306 of

the Maryland Election Law currently requires those engaging in "public communications,"

including on websites, to register and report to the Board the following information:

11

(1) the identity of the person making the independent expenditures and of the person exercising direction or control over the activities of the person making the independent expenditures;

(2) the business address of the person making the independent expenditures;

(3) the amount and date of each independent expenditure during the period covered by the report and the person to whom the expenditure was made;

(4) the candidate or ballot issue to which the independent expenditure relates and whether the independent expenditure supports or opposes that candidate or ballot issue; and

(5) the identity of each person who made cumulative donations of $6000 or more to the person making the independent expenditures during the period covered by the report.

Md. Code, Elec. Law § 13-306; *see also id.* § 13-307 (imposing substantially identical requirements for "electioneering communications," including communications capable of being received by 5,000 people on Internet websites); COMAR § 33.13.02.02 (implementing Section 13-304(b)(1) and imposing detailed reporting requirements on campaign committees).

In addition, the Act imposes certain disclosure requirements on political advertisers applicable to the campaign materials themselves. Specifically, Maryland Election Law Section 13-401(a)(1) provides that "campaign material shall contain . . . an authority line that states" (a) a campaign entity, as well as the name and address of its treasurer, if published by a campaign finance entity, (b) the name and address of the person responsible, if published by any other person, or (c) a specific statement, if published in opposition to a candidate, but not authorized by a candidate.

**C.     The Harm to the Publisher Plaintiffs**

The challenged provisions of the Act impose a substantial burden on Publisher Plaintiffs, as explained in greater detail in the accompanying declarations. The Publisher Plaintiffs believe that the State's requirement that they engage in compelled speech violates the fundamental independence to which they are entitled under the First Amendment. In many instances, the

information required to be published, collected, maintained and/or produced is not something that is collected or, if collected, is not stored in a manner that is easy to produce without substantial burden.  And, some of the information the Act requires them to make public information they consider proprietary.

Ultimately, the Act requires each publisher to choose between enduring a substantial burden or ultimately determining that it cannot accept political advertising because the burden is too onerous.  Despite its substantial resources, and its significant presence in the market for digital on-line advertising, Google has announced that, because of the Act, it will no longer accept political advertising in Maryland.[10]

As explained in their declarations, if Publisher Plaintiffs are forced to make a similar choice, this will work both a financial injury on the Publisher Plaintiffs and will also substantially curtail the speech available to the citizens of Maryland, as is already the case in the wake of the choice Google has made.  Particularly at a time when legitimate political debate is crucial, and when newspapers throughout the State are financially challenged by a changing media landscape, this is a burden that neither Publisher Plaintiffs nor the public can afford to accept.  And it is one that, given the other regulations directly applicable to political speakers and advertisers, is ultimately both unnecessary and unconstitutional.

## ARGUMENT

Preliminary injunctive relief is warranted where the moving party can show: (1) a likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence of such relief, (3) that the balance of equities tips in its favor, and (4) that granting an injunction

---

[10] *See* Michael Dresser, *Google no longer accepting state, local election ads in Maryland as result of new law*, The Baltimore Sun, June 29, 2018, http://www.baltimoresun.com/news/maryland/politics/bs-md-google-political-ads-20180629-story.html.

would be in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Each can be shown here.

## I.      The Publisher Plaintiffs Are Likely To Succeed On The Merits Of Their Challenge To The Act

### A.      The Act Is Unconstitutional Under The First, Fourth, And Fourteenth Amendments

It is well established that speech on "public issues occupies the highest rung of the

hierarchy of First Amendment values and is entitled to special protection."  *Snyder v. Phelps*,

562 U.S. 443, 444 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).  That holds true

even where, as in the political ads regulated by the Act, the speech takes the form of paid

advertising.  *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 342-43 (2010) (political

expenditures by corporate entities constitute protected First Amendment activity); *New York

Times Co. v. Sullivan*, 376 U.S. 254, 270-71 (1964) (issue-based advertisement placed by civil

rights leaders addressed "one of the major public issues of our time," and newspaper which

published it "clearly . . . qualif[ied] for . . . constitutional protection").  Nonetheless, the Act

subjects that core political speech to a series of onerous – and ultimately unconstitutional –

regulations, including on publishers who are supplying the forum for the speech, as explained in

detail below.

### 1.      The Act Compels Speech In Violation Of The First Amendment

As an initial matter, the Act is unconstitutional because it compels speech in violation of

the First Amendment.  It is well established "that the right of freedom of thought protected by the

First Amendment against state action includes both the right to speak freely and the right to

refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *see also Hurley v.

Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995) ("one important

manifestation of the principle of free speech is that one who chooses to speak may also decide

'what not to say'"); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988) (the

First Amendment's protections apply to "decision[s] of both what to say and what *not* to say");

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879

F.3d 101, 111 (4th Cir. 2018) (same).  Though this principle applies to *all* speakers, and to any

governmental attempts to compel speech in service of a particular viewpoint or agenda, it is

especially salient in the context of government regulation of news organizations, where their

editorial independence is at stake.  In this case, the Act requires online publishers to publish "in a

clearly identifiable location" on their websites – and keep published for at least one year after the

relevant general election – certain information about online political ads and their purchasers.

Md. Code, Elec. Law § 13-405(b)(3), (6).  However laudable the purpose animating the Act's

disclosure regime may be, as a matter of well-settled constitutional law, the government cannot

conscript private media entities in service of such goals.

This was definitively laid out in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241

(1974).  There, the Supreme Court held unconstitutional under the First Amendment a Florida

law that provided that political candidates subject to criticism in a newspaper had "the right to

demand that the newspaper print, free of cost to the candidate, any reply the candidate may make

to the newspaper's charges."  *Id.* at 244.  While the Court praised the law's goal of attempting to

ensure that "a wide variety of views reach the public," it nonetheless held that the law's means of

pursuing that goal constituted an unconstitutional intrusion on editorial independence.  *Id.* at 248,

254, 259.  As the Court explained, in language that has equal application here:

> A newspaper is more than a passive receptacle or conduit for news, comment, and
> advertising.  The choice of material to go into a newspaper, and the decisions
> made as to limitations on the size and content of the paper, and treatment of
> public issues and public officials – whether fair or unfair – constitutes the exercise
> of editorial control and judgment.  It has yet to be demonstrated how

> governmental regulation of this crucial process can be exercised consistent with
> First Amendment guarantees of a free press as they have evolved to this time.

*Id.* at 258.  That the government is, in this particular case, requiring publishers to host statements of fact, rather than advocacy, makes no difference.  The "general rule . . . that the speaker has the right to tailor the speech . . . applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid."  *Hurley*, 515 U.S. at 573; *see also Riley*, 487 U.S. at 797-78 (applying *Tornillo* and its progeny to strike down law compelling professional fundraisers to disclose percentage of funds they retain, and observing that "compelled statements of 'fact,'" like "compelled statements of opinion," "burden[] protected speech").  Because the Act compels online publishers to publish certain facts (including propriety facts about the publishers' advertising revenue), based on the State of Maryland's assessment of what information about online political ads the public should know, the Act is unconstitutional.

To be clear, the Publisher Plaintiffs are not taking any position on the lawfulness of the disclosure requirements that Act imposes on the advertisers themselves.  There are circumstances in which, consistent with the First Amendment, a *speaker* can be subject to mandatory disclosure requirements.  For instance, in the context of "commercial advertising," the government may, under certain circumstances, require disclosure of certain factual information by the advertiser.  *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).  Putting aside that the speech at issue here is decidedly not commercial speech,[11] any such obligations are properly imposed on the advertiser, not on the forum in which the speech appears.  Similarly, although the

---

[11] The category of "commercial speech" is defined as speech that "does no more than propose a commercial transaction."  *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (internal marks omitted).  Here, the Act explicitly defines the advertisements giving rise to these disclosure obligations as advertisements that do "not propose a commercial transaction." Md. Code, Elec. Law § 1-101(ll-1) (defining a "qualifying paid digital communication").

16

Supreme Court has held upheld the constitutionality of some disclosure requirements placed on the *speakers* of election-related speech, *Citizens United*, 558 U.S. at 368-69, that is quite different from imposing such requirements on third parties, as the Act does here.  And, although the FCC may constitutionally impose certain requirements on broadcasters based on their special status and their access to the government-controlled broadcast spectrum, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 395 (1969); *FCC v. Pacifica Found.*, 438 U.S. 726, 748 (1978), the First Amendment does not permit imposing similar requirements on other speech, including on the Internet, *see, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 869-70 (1997).  The Publisher Plaintiffs are aware of no circumstances, outside the broadcast context, in which such disclosure requirements have been lawfully imposed on forums for speech.

The bottom line is that, however well-intentioned the Act may be, the government may not conscript the platforms of online publishers in service of its agenda.  For that reason alone, the Act is unconstitutional.

## 2.     The Act Cannot Withstand Strict Scrutiny

The Act is also unconstitutional because the Act as a whole – and not just the provisions compelling speech – cannot withstand strict-scrutiny review.  It is well established that "a content-based regulation of speech . . . is subject to strict scrutiny."  *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015).  A "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).  Thus, "a speech regulation targeted at specific subject matter is content based *even if it does not discriminate among viewpoints within that subject matter*."  *Id.* at 2230 (emphasis added).  Under this framework, the Act is plainly a content-based regulation of speech.  Its application to any particular advertisement turns on the

subject matter, specifically, on whether it "relates to a candidate, a prospective candidate, or the approval or rejection of a [ballot] question or prospective [ballot] question." Md. Code, Elec. Law § 1-101(k)(1)(ii). Thus, the Act directly regulates speech based on its content. *See, e.g.*, *Reed*, 135 S. Ct. at 2226-31 (town code subjecting signs to different restrictions based on the subject-matter they addressed was a content-based restriction); *Cahaly*, 796 F.3d at 405 (anti-robocall statute, which applied only to consumer or political calls, was content-based restriction).

Because the Act is subject to strict-scrutiny review, the State bears the burden of demonstrating that it "furthers a compelling interest," is "narrowly tailored to achieve that interest," and that there are no less restrictive alternatives to accomplish that purpose. *Reed*, 135 S. Ct. at 2226, 2231; *see also Cahaly*, 796 F.3d at 405 (same). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Greater Baltimore Ctr. for Pregnancy Concerns*, 879 F.3d at 111 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)). Thus, to satisfy strict-scrutiny review, the government "must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (internal citations omitted); *see also United States v. Alvarez*, 567 U.S. 709, 726 (2012) (there must be "a causal link between the Government's stated interest and the Act"). Here, the government cannot meet that standard. Even assuming that counteracting foreign use of digital ads to influence United States' elections is a compelling interest, the Act burdens significantly more speech – and significantly more *speakers* – than is necessary to pursue that aim. That is so in at least four ways.

First, while the State may have an interest in minimizing the possibility that its electorate will be unwittingly subject to foreign manipulation, there is no reason why – particularly given

the First Amendment's restrictions on compelled speech discussed above – accomplishing that goal requires imposing these regulations on *publishers* of online political ads, rather than just on the candidates and campaigns.  Indeed, the challenged provisions were enacted against the backdrop of a number of other provisions of Maryland election law, including as amended by the Act, that impose extensive disclosure and reporting requirements on purchasers of political advertising  – *i.e.*, on the speakers themselves.  As detailed above, Section 13-401 of the Election Law requires disclosure statements on political advertisements themselves, and Sections 13-304, 13-306 and 13-307 require those engaged in "public communications" or "electioneering communications" to register and then to report various information to the Board, information that the Board could easily publish on its own website if public dissemination were deemed important.  These existing requirements make plain that there are in fact less restrictive means by which Maryland could address the problem it is purportedly addressing.  *See, e.g.*, *Alvarez*, 567 U.S. at 729 (declaring unconstitutional statute criminalizing falsely claiming to have received military honors because government could instead "protect the integrity of the military awards system" by setting up its own publicly accessible database listing medal recipients).

Second, to the extent that the intent of the Act is to require online publishers to backstop those self-reporting requirements – which would in and of itself be overbroad on its face – the Act does not accomplish that objective either.  Under the Act, purchasers of qualifying ads are responsible for providing notice to the online publisher that the ads they are placing fall within the purview of the Act.  Md. Code, Elec. Law § 13-405(a)(1)-(3).  It is that notice that then triggers the online publisher's publication and record-keeping obligations.  *Id.* § 13-405(b)(6), (c)(3).  Because the express purpose of this Act is to police attempted Russian manipulation into elections, and because the prototypical Russian operative targeted by the Act is highly unlikely

to self-identify in a manner that triggers an online platform's obligations, any supposed benefit from the elaborate publishing and reporting requirements imposed on online publishers will not be achieved.  There is therefore a complete disconnect between the articulated purpose of the Act and its operation, and, as a result, the Act is in no way tailored to address the problem it purports to address.  *See, e.g.*, *Brown*, 564 U.S. at 799 ("the curtailment of free speech must be actually necessary to the solution").

Third, even if there is some reason why the Act needs to regulate the conduct of publishers in addition to the speakers themselves, there is a fundamental disconnect between the State's own diagnosis of the problem it is addressing and the publishers it has targeted with its legislation.  The drafters and supporters of the Act have been uniform in their assessment that the problem the law is trying to address centers on the use of large social-media or search-engine platforms like Facebook, Google, or YouTube as conduits for foreign governments – especially Russia – to disseminate fake political speech, both paid and unpaid.  *See* Facts, Part B.1. *supra* (describing legislative history of the Act).  At no point in the legislative consideration of the Act was there any suggestion that foreign political ads published on the websites of newspapers and numerous other websites covered by the Act are part of that problem being addressed.  *See id.* Yet, the Act is dramatically overinclusive in that it sweeps within its ambit *any* "public-facing website" that accepts paid political ads and averages a "100,000 or more unique monthly United States visitors."  Md. Code, Elec. Law § 1-101(dd-1)(1)-(2).  To put that number in perspective, a mid-sized Maryland newspaper publishers' websites easily satisfies that threshold, even though there is no basis to conclude that misleading foreign political advertising has *ever* been an issue with such a publication.  In contrast, New York, which recently passed its "Democracy Protection Act" designed to achieve similar purposes as the Maryland law, promulgated

20

regulations limiting its application to online platforms with *70 million or more* unique monthly visitors, and further exempting websites of newspapers from the law.[12]  New York's ability to address this issue without burdening newspaper websites underscores that the Maryland statute is not narrowly drawn and that less restrictive alternatives to the Act are readily available.[13]

Fourth, even if there is some reason why the Act needs to regulate the conduct of publishers, *and* why it targets all websites of even relatively modest size, the specific obligations it imposes go well beyond what it is even conceivably required to achieve the disclosure and reporting objectives of the Act.  The burdensome nature of the obligations the Act imposes on online publishers is described in detail above and in the accompanying Declarations.  As their Declarations explain, the onerous nature of the Act's provisions has caused a number of Publisher Plaintiffs to question whether they can continue to accept political advertising, following the lead of Google, which has already decided not to do so.[14]

---

[12] *See* 9 NYCRR §§ 6200.10, 6200.11, *available at* https://www.elections.ny.gov/ NYSBOE/download/law/EmergencyAdoptionAndNoticeofRevisedRulemakingof 9NYCRRsubtitleVpart620010and620011.pdf.

[13] Not only is the Act overinclusive by including far more speech and many more speakers that necessary to achieve its legislative aims, it is also underinclusive in a different respect.  The sponsors of the Act were expressly concerned about both paid and unpaid speech posted on social media platforms, but the Act regulates only "paid digital communications."

[14] To underscore the substantially overbroad nature of these requirements, it is worth again comparing the Act to what other states that have addressed this issue have done.  For instance, the New York law, in addition to applying to a much narrower group of online publishers and exempting newspaper websites, does not contain any affirmative publication requirement, and is triggered only by ads that explicitly call for the election or defeat of a clearly identified candidate or ballot proposal.  N.Y. Elec. Law § 14-107.  The State of Washington, which recently amended its longstanding law regarding transparency in political advertising so that it applies to online advertisements, likewise does not impose any affirmative publication requirement and is similarly limited to ads that appeal for "votes or for financial or other support or opposition in [an] election campaign."  Wash. Rev. Code § 42.17A.005(39).  Neither state authorizes a court to enjoin an advertisement from publication.  While the Publisher Plaintiffs do not take any position as to whether the New York and Washington laws are ultimately constitutional, at the very least, they demonstrate that there are dramatically less restrictive alternatives to the Maryland scheme.

In sum, the Act, while burdening the dissemination of core political speech, (a) subjects publishers to disclosure and reporting requirements already imposed directly on the purchasers of political ads, (b) places publishers in a position where they are both required to backstop the disclosure obligations of ad purchasers and reliant on the ad purchasers to self-report, (c) addresses a problem that concededly does not involve the lion's share of the state's websites, including those of Publisher Plaintiffs, and (d) subjects online publishers to a series of burdensome requirements that go well beyond what could conceivably be required to pursue the aims of the Act. Accordingly, the Act fails the exacting level of constitutional scrutiny required. *See, e.g.*, *Aschcroft v. ACLU*, 542 U.S. 656, 670-72 (2004) (preliminary injunction properly granted enjoining content-based restriction on speech, enacted to protect children, where government could not show that less restrictive alternatives would not be effective); *Greater Baltimore Ctr. for Pregnancy Concerns*, 879 F.3d at 112 (scheme regulating speech based on content was unconstitutional where "there [was] only a loose fit between the compelled disclosure at issue and the purported ills identified by the government").[15]

### 3.      The Act Is Unconstitutionally Vague

The Act is also unconstitutionally vague, in violation of the First and Fourteenth Amendments, in the duties it imposes on online publishers. The Court of Appeals has explained

---

[15] The same is true with respect to the provision requiring payment for ads in United States currency. Md. Code, Elec. Law § 13-405.2. The sponsors of the Act announced at a committee hearing that they intended to remove this provision, giving an ad placed from Canadian as an example, *see* http://mgahouse.maryland.gov/mga/play/0f183b99-dfef-4eb4-8dbe-b1f6369a3d56/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c&playfrom=5280000 (1:36:52 – 1:37:26), but it was ultimately included in the legislation. At least some of Publisher Plaintiffs accept legitimate issue ads from foreign governments or other foreign groups, and label them as such. This speech enhances public debate about the issues of the day and should not be squelched by this provision, particularly when there is no evidence that most foreign governments (including Canada, to use the sponsors' own example) have interfered, or attempted to interfere, with our elections.

that "[a] statute can be impermissibly vague for either of two independent reasons.  First, if it

fails to provide people of ordinary intelligence a reasonable opportunity to understand what

conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory

enforcement."  *United Seniors Ass'n v. Social Sec. Admin.*, 423 F.3d 397, 408 (4th Cir. 2005)

(citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Doe v. Cooper*, 842 F.3d 833, 842

(4th Cir. 2016) (noting, in considering a vagueness claim, that "[a] state law violates due process

if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so

standardless that it authorizes or encourages seriously discriminatory enforcement") (internal

marks omitted).  In this case, the statute is unconstitutionally vague in the following ways:

First, the Act defines what type of ad triggers its obligations in incredibly broad terms.

Specifically, the Act defines a "qualifying paid digital communication" such that it encompasses

any paid ad that merely "*relates* to a candidate, a prospective candidate, or the approval or

rejection of a question or prospective question."  Md. Code, Elec. Law § 1-101(k)(1)(ii), (ll-1)(1)

(emphasis added).  Thus, any paid ad that touches in any fashion on a topic at issue in an

upcoming contested election could qualify as an ad subject to the Act.  No further guidance or

limitation is provided.

Second, the confusion is compounded by the fact that the Act's key terms are defined in a

circular fashion.  For instance, a "qualifying paid digital communication" is defined as, *inter

alia*, "campaign material," but "campaign material" is defined to include "a qualifying paid

digital communication."  *Id.* § 1-101(k)(2)(I), (ll-1)(1).

Third, while the Act requires online publishers to make certain information available to

the Board within 48 hours of the posting of a qualifying ad, some of the information that must be

made available – such as, the "dates and times that" the ad "was first disseminated and *last*

23

disseminated," and the "total number of impressions generated by" the ad – will not exist yet. *Id.* § 13-405(c)(1)-(3).  No guidance is provided as to the obligations of online publishers in those circumstances.

Fourth, the Act leaves unclear what, if any, information online publishers must independently gather to comply with their publication and record-keeping obligations, and what information they may gather from the persons or organizations placing the ads.  The Act states that purchasers of qualifying ads must provide online publishers with "the information necessary" to comply with the publishing and record-keeping duties imposed by subsections (b) and (c) of Section 13-405.  *Id.* § 13-405(d)(1)-(2).  But the Act does not explain how advertisers are supposed to provide information like the number of impressions, geographic targets, date first and last disseminated, etc., effectively imposing that burden on the online publishers, and sowing additional confusion.

Fifth, the Act requires online publishers to make "reasonable efforts" to assist the Board in ensuring that ad purchasers comply with the Act, and with Section 13-401, but says nothing about what "reasonable efforts" means in this context in connection with parties that are not under the control of the online publishers.  *Id.* § 13-405(e)(1)-(3).

Finally, the Act purports to require Online Platforms to make reasonable efforts to comply with the federal Stored Communications Act, in complying with a subpoena issued in connection with an investigation into an ad purchaser's compliance.  *Id.* § 13-405(f).  It is entirely unclear what the Act intends by requiring reasonable efforts to comply with an existing federal statute, while at the same time imposing different substantive obligations and different penalties on Online Platforms under the Maryland Act.

24

The effect of all this, especially taken in combination, is to leave online publishers in a position where they cannot discern what they must, and must not, do under the Act.  That is an intolerable state of affairs under any circumstance, but it is especially so where First Amendment rights are implicated since "vagueness . . . raises special First Amendment concerns because of its obvious chilling effect on free speech."  *Reno v. ACLU*, 521 U.S. at 871-72.  Indeed, the danger here is that online publishers, unclear about what the Act requires of them, will decide that accepting the kind of ads subject to the Act is no longer worth the trouble, which is an especially serious problem given how broadly the Act defines the category of ads at issue.  That is the direction that Google has already gone, and it is a direction that others might be pushed as well.  That dynamic – in which the Act imposes vague duties that, in turn, results in the avoidance of speech – is yet another constitutional infirmity.

### 4.    The Act Authorizes Unconstitutional Injunctions Against Speech

The Act is also constitutionally infirm because it authorizes unconstitutional injunctions against speech.  Specifically, the Act authorizes a Maryland Circuit Court, upon an action brought by the Maryland Attorney General, to issue an injunction requiring the *publisher* to remove a political ad based on the ad *purchaser*'s failure to comply with the requirements of the Act.  Md. Code, Elec. Law § 13-405.1(b)(1)-(2).[16]  Any injunction issued pursuant to that scheme would constitute an unconstitutional prior restraint.

---

[16] In addition, while the statutory language is far from clear, the Act can also be read to confer upon Maryland Circuit Courts general powers to "grant injunctive relief" in connection with any violation of any kind of the Act.  Md. Code, Elec. Law § 13-405.1(b)(3).  The ambiguity arises because it is not clear whether the reference to "injunctive relief" in Subsection 3 of Section 13-405(b) is only a reference to the specific forms of injunctive relief described in the preceding two subsections, or whether that reference contemplates broader powers to grant injunctive relief.  Either way, the scheme is constitutionally flawed, for the reasons explained herein.

25

The Supreme Court has long held that prior restraints are one of "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 562 (1976); *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (prior restraint has "a heavy presumption against its constitutional validity"). As relevant here, what defines a "prior restraint" – and constitutes its "special vice" – is that it involves the suppression of speech "before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973).

That is precisely what the Act authorizes. While the Act provides for an adjudication prior to the issuance of injunction mandating removal of an ad, Md. Code, Elec. Law § 13-405.1(b)(3), the issue that is being adjudicated – whether the Act has been violated in connection with the ad – bears no relation to whether the ad itself is protected under the First Amendment. The Supreme Court has repeatedly emphasized that only very limited categories of speech are unprotected. *See, e.g.*, *Alvarez*, 567 U.S. at 717 (identifying categories of unprotected speech as "advocacy intended . . . to incite imminent lawless action," "obscenity," "defamation," "fighting words," "child pornography," "fraud," "true threats," and "speech presenting some grave and imminent threat the government has the power to prevent"); *Brown*, 564 U.S. at 791 (same); *United States v. Stevens*, 559 U.S. 460, 468 (2010) (same). In this case, the Act provides for injunctions ordering the removal of core political speech without *any* adjudication as to whether the speech falls into one of those unprotected categories and, indeed, without any notice to the publisher (since the Act requires notice only to the advertiser, *see* Md. Code, Elec. Law § 13-405.1(b)(2)). Worse still, the Act provides for removal of material from the publisher's platform based only on non-compliance by the *purchaser* of the ad. That represents an additional offense against the First Amendment, since it embraces the unconstitutional notion "that speech by a

26

law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001) (holding that speech on matters of public concern may not be punished based on the conduct of third-party who supplied information giving rise to the speech).

In short, the Act creates an enforcement regime that authorizes unconstitutional remedies against online publishers, and should be invalidated on that ground as well.

### 5.    The Act Authorizes Unconstitutional Seizures of "Papers"

Finally, the Act violates the Fourth Amendment rights of online publishers because it requires them to turn over sensitive records to the Board on demand, without any showing that the request relates to an alleged violation by an advertiser and without any opportunity to object. *See* Md. Code, Elec. Law § 13-405(c)(2)-(3) (obligating online publishers to make various records available to the Board "on the request of" Board).  Such a scheme, which authorizes a government seizure of a publisher's records in the absence of any judicial or even quasi-judicial process, is unconstitutional.

This is made clear by *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015), where the Supreme Court invalidated an analogous scheme involving searches of hotel records.  There, the Court held that an arrangement that required hotel operators to keep records containing various information about their guests, and then to make those records "available to any officer of the Los Angeles Police Department for inspection" upon request, was unconstitutional under the Fourth Amendment because it did not provide any opportunity on the part of a hotel owner to object to a request or to have the objection adjudicated by a "neutral decisionmaker."  *Id.* at 2448, 2452-53; *see also Free Speech Coal., Inc. v. Attorney General*, 825 F.3d 149, 155, 168-72 (3d Cir. 2016) (provision in statute requiring producers of sexually explicit material to make

"available for inspection by the Attorney General 'at all reasonable times'" records the statute required producers to keep regarding their performers was unconstitutional under *Patel*).  The same problems exist with the scheme put in place by the Act, which likewise does not permit either objections or any opportunity for precompliance review.

Indeed, if anything, the constitutional problems with this scheme are even more severe than in *Patel*, given that it authorizes government inspections of media organizations, engaged in protected First Amendment activity.  The First, Fourth and Fourteenth Amendments are closely related and operate together to "ensure against the curtailment of constitutionally protected expression."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963).  Indeed, "[t]he Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression."  *Marcus v. Search Warrants of Property at 104 E. Tenth St.*, 367 U.S. 717, 724, 729 (1961); *see also Patel*, 135 S. Ct. at 2453 (noting dangers of government harassment raised by scheme that permits searches outside the judicial process).  Accordingly, the Act is unconstitutional for this reason as well.

### B.      The Act Is Preempted By Section 230 of the Communications Decency Act

In addition to the Act's extensive constitutional infirmities, it is also preempted by Section 230 of the Communications Decency Act of 1996 ("Section 230").  47 U.S.C. §§ 230(c)(1), (e)(3).  Subject to limited exceptions not relevant here, Section 230 bars enforcement of state laws that impose liability on online platforms by making them responsible for third-party content posted at their websites.  Because the Act does exactly what Section 230 forbids – subjects online publishers to penalties based on third-party content posted on their websites – it is preempted by Section 230.

Section 230 provides, in pertinent part, that "[n]o provider or user of an interactive

computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Accordingly, it "creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).  In enacting the statute, "Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them." *Nemet Chevrolet, Ltd. v.  Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009); *see also Baldino's Lock & Key Serv., Inc. v. Google, Inc.*, 88 F. Supp. 3d 543, 547 (E.D. Va. 2015) ("The immunity extends to all information posted that does not originate with the defendant as an information content provider.").

Courts apply a three-part test in determining whether Section 230 immunity applies, asking (1) whether the party claiming immunity "is a provider of an interactive computer service"; (2) whether "the postings at issue are information provided by another information content provider"; and (3) whether the party claiming immunity is being treated "as a publisher or speaker of third party content."  *McDonald v. LG Elecs. USA, Inc.*, 219 F. Supp. 3d 533, 536 (D. Md. 2016).  All three requirements are met here.

First, online publishers operating websites, like Publisher Plaintiffs, are clearly "providers of an interactive computer service" in connection with their hosting of third-party content.  *See, e.g.*, *Nemet*, 591 F.3d at 255 (consumer review website qualified as an interactive computer service for purpose of Section 230); *Hadley v. Gatehouse Media Freeport Holdings, Inc.*, 2012 WL 2866463, at *1-2 (N.D. Ill. July 10, 2012) (website for newspaper that allowed posting of comments was an "interactive computer service"); *Collins v. Purdue Univ.*, 703 F. Supp. 2d 862, 868, 879 (N.D. Ind. 2010) (same).  Second, the political ads themselves are

"information provided by another information content provider."  Indeed, courts routinely hold that third-party ads hosted on a website qualify as third-party content for purposes of Section 230.  *See. e.g.*, *Doe v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016); *Baldino's Lock & Key Serv.*, 88 F. Supp. 3d at 543; *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193 (N.D. Cal. 2009).

Third, the Act purports to treat online platforms as the "publisher or speaker" of the third-party content in question, subjecting online publishers to numerous duties arising from the publication of the political ads on their websites.  Just by way of example, the Act provides for the removal of political ads on pain of contempt or criminal sanctions.  *See* Md. Code, Elec. Law § 13-405.1(b)(1)-(4).  Decisions about whether "to publish, edit, or withdraw" online content are quintessential publishing decisions; thus, any scheme that would impose liability on an online platform for failing to remove third-party content treats the platform as the publisher of that content in a manner that is contrary to Section 230.  *Zeran*, 129 F.3d at 332-33; *see also Hassel v. Bird*, 420 P.3d 776, 789 (Cal. 2018) (injunction requiring Yelp to remove third-party review that had been conclusively adjudicated as actionable defamation violated Section 230 because relief was premised on Yelp's ongoing decision not to remove review).

In short, because the Act imposes duties on online publishers based on third-party content they host, it is preempted by Section 230, is invalid and cannot be enforced.

## II.  Publisher Plaintiffs Also Satisfy Each of the Other Factors Warranting Preliminary Injunctive Relief

The remaining requirements for entitlement to preliminary injunctive relief are all met as well.  That conclusion follows more or less automatically from the fact that the Act imposes requirements that violate the First Amendment.

First, the Publisher Plaintiffs have submitted declarations detailing the actual, practical harm they – and by extension their readers – will face from the Act.  These include the

substantial burdens and expense they face, and the very real prospect that some or all of them will conclude that they simply can no longer accept political advertisings in light of the Act's onerous requirements and harsh penalties.  But even without this record, applicable law presumes irreparable injury where, as here, plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment claims.  Indeed, "it is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (holding that permanent injunction was properly granted, and concluding that irreparable injury could be presumed based on finding that statutory scheme violated First Amendment); *see also Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (holding that it was an abuse of discretion not to issue preliminary injunction because regulations at issue violated First Amendment, and irreparable harm could therefore be presumed); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002) (affirming grant of preliminary injunction and presuming irreparable harm based on finding that statute violated First Amendment).  That is because "the inherently communicative purpose of First Amendment activity" makes after-the-fact monetary compensation "legally insufficient as a remedy."  *Rossignol v. Voorhar*, 316 F.3d 516, 522 (4th Cir. 2003).

Second, the balance of equities tips decisively in the Publisher Plaintiffs' favor, particularly given the grave constitutional problems on the merits.  Because the Act is "likely to be found unconstitutional" – indeed, as noted, the Governor himself has publicly expressed doubts about its constitutionality – the State of Maryland will suffer no harm from "issuance of a preliminary injunction" preventing it from "enforcing [the Act's] restrictions."  *Giovani Carandola,* 303 F.3d at 521; *see also Legend Night Club*, 637 F.3d at 302 (same); *Newsom*, 354

F.3d at 261 (same).  Indeed, "[i]f anything, the system is *improved* by such an injunction." *Giovani Carandola,* 303 F.3d at 521 (emphasis added).

Finally, with respect to the requirement that the preliminary injunction serve the public interest, it cannot be seriously disputed that "upholding constitutional rights is in the public interest."  *Legend Night Club*, 637 F.3d at 303; *see also Newsom*, 354 F.3d at 261 (same); *Giovani Carandola,* 303 F.3d at 521 (same).  Here, protecting the constitutional rights of the Publisher Plaintiffs and similar websites by enjoining the Act, which will in turn facilitate the broad dissemination of electoral speech, is unquestionably in the public interest.

Because all four factors weigh heavily in Publishers' favor, this Court should issue a preliminary injunction.[17]

---

[17] The Publisher Plaintiffs also ask that no bond be required (or that only a nominal amount be set).  The Court of Appeals has explained that "[w]here the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly.  In some circumstances, a nominal bond may suffice." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999); *see also Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("the district court retains the discretion to set the bond amount as it sees fit or waive the security requirement").  Waiving the bond requirement, or requiring the posting of only a nominal amount in security, is appropriate here because, *inter alia*, issuance of an injunction will cause no monetary damages to Defendants. *See, e.g.*, *Planned Parenthood of Cent. N.C. v. Cansler*, 804 F. Supp. 2d 482, 501 (M.D.N.C. 2011) (issuing preliminary injunction against state agency enjoining enforcement of law, and ruling that "[g]iven the lack of any monetary injury to Defendant, no bond will be required"); *Hassay v. Mayor & City Council of Ocean City, Md.*, 955 F. Supp. 2d 505, 527 (D. Md. 2013) (noting that "any costs suffered by defendants during the period of the preliminary injunction will be minimal or nonexistent," and requiring only "$1.00" in security); *Doe v. Pittsylvania Cty., Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012) (fixing "the amount of the security bond at zero dollars" because "the prevailing law in this circuit makes it clear that it is highly likely that plaintiff will prevail on the merits and there can be no monetary damages or other harm" to the defendant as a consequence of issuing the preliminary injunction).

**CONCLUSION**

For the reasons set forth above, the Publisher Plaintiffs respectfully request that this

Court issue a preliminary injunction enjoining enforcement of the Act.

Dated: August 17, 2018                        Respectfully submitted,

                                             BALLARD SPAHR LLP


                                             By: */s/Seth D. Berlin*
                                                  Seth D. Berlin (Bar No. 12617)
                                                  Paul J. Safier (*pro hac vice* motion to be filed)
                                                  Dana R. Green (*pro hac vice* motion to be filed)

                                             1909 K Street, NW, 12th Floor
                                             Washington, DC 20006
                                             Telephone: 202.661.2200
                                             Facsimile: 202.661.2299
                                             berlins@ballardspahr.com
                                             safierp@ballardspahr.com
                                             greend@ballardspahr.com

                                             *Attorneys for Plaintiffs*