**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| THE WASHINGTON POST, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.: PWG-18-2527 |
| | * | |
| DAVID J. MCMANUS, JR., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

In May 2018, as Americans were continuing to learn the details of a far-reaching Russian campaign to influence the 2016 U.S. presidential contest, the state of Maryland enacted a new law to combat foreign interference in its elections.  The law, known as the Online Electioneering Transparency and Accountability Act (the "Act"), sought primarily to curb foreign nationals' exploitation of Facebook, Instagram, and other social media sites, but its reach was broader than that, extending to many established newspapers' websites.  It requires social media sites and news sites alike to self-publish information about the political ads they run and to make records about those ads available for state inspection.

The Act's passage into law spurred an immediate response from the Washington Post and other media outlets with an online presence in Maryland.   The outlets (collectively, "Plaintiffs") brought this action in federal court to enjoin enforcement of the portions of the Act applying to online publishers, primarily (but not exclusively) arguing that the disclosure and record-keeping requirements codified at Md. Code Ann., Elec. Law § 13-405 violate their First Amendment rights

of free speech and a free press. The issue before me at this stage of the proceedings is whether Plaintiffs are entitled to a preliminary injunction.[1]

I conclude that Plaintiffs' First Amendment claim is likely to succeed on the merits. This conclusion stems from my determination that the Act's impositions on online publishers are subject to strict scrutiny and that they most likely would not withstand this form of judicial review. I further conclude that, even if I were to analyze the statute under the more forgiving standard of "exacting scrutiny," the Plaintiffs have shown they would likely prevail. As I am satisfied, as well, that Plaintiffs have met the other requirements for preliminary injunctive relief, their request to preliminarily enjoin enforcement of section 13-405, as applied to them, will be granted.

## FACTUAL BACKGROUND

The Maryland statute is among a number of state responses[2] to revelations that Russia exploited social media in a campaign to sway public opinion in the United States ahead of the 2016 presidential election. The details of the Russian operation are still emerging; in fact, roughly one month after the hearing on Plaintiffs' motion for preliminary injunctive relief, the U.S. Senate Select Committee on Intelligence announced the release of two reports chronicling Russian efforts to sow discord in the United States. *See* Press Release, U.S. Senate Select Comm. on Intelligence, New Reports Shed Light on Internet Research Agency's Social Media Tactics (Dec. 17, 2018), https://www.intelligence.senate.gov/press/new-reports-shed-light-internet-research-agency% E2%80%99s-social-media-tactics. While there is nothing in the Federal Rules of Evidence or the

---

[1] The motion for preliminary injunctive relief has been fully briefed. *See* ECF Nos. 9, 9-1, 24, 31, 37. A hearing took place on November 16, 2018.

[2] New York and Washington each updated their election transparency laws this year in a roughly similar fashion. *See* Democracy Protection Act, 2018 N.Y. Sess. Laws ch. 59, pt. JJJ (McKinney) (codified at N.Y. Elec. § 14-100, -106, -107, -126); 2018 Wash. Legis. Serv. ch. 304 (amending state campaign finance laws, including Wash. Rev. Code § 42.17A.005).

Rules of Civil Procedure that prevents me, at this stage of the proceedings, from considering the reports' findings or other facts that have been widely reported in the press, *see G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016) (stating that courts may consider potentially inadmissible evidence when ruling on a motion for preliminary injunction), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017) (mem.); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013), the narrow issue before me does not demand an exhaustive retelling of the story here. I will instead confine my review to a limited number of sources. These include a set of indictments the special counsel for the U.S. Department of Justice secured in February 2018 against Russian nationals suspected of attempting to meddle in the 2016 election. *See* Indictment, *United States v. Internet Research Agency LLC*, No. 18-cr-32-DLF (D.D.C. Feb. 16, 2018), ECF No. 1. Beyond that, I will look to the record in this case, which includes a handful of reports, affidavits, and declarations purporting to summarize the role that Russian subterfuge played in the 2016 national and Maryland elections.

**A.**

For many Americans, the extent of the Russian online operations began to come into focus in January 2017, when U.S. intelligence agencies released a declassified report summarizing Russia's campaign to shape U.S. public opinion. *See* Office of Dir. of Nat'l Intelligence, Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent U.S. Elections (Jan. 6, 2017), https://www.dni.gov/files/documents/ICA_2017_01.pdf [hereinafter ICA Report]; Albright Decl. 4-5, ECF No. 31-1. The report, representing the joint findings of the Central Intelligence Agency ("CIA"), Federal Bureau of Investigation ("FBI"), and National Security Agency ("NSA"), concluded that Russian President Vladimir Putin had personally ordered the operations as part of a broader strategy to "undermine public faith in the US democratic

process" and to damage the Democratic nominee's chances in the November 2016 presidential election. *See* ICA Report, *supra*, at 1. The campaign encompassed a range of tactics, which – beyond the online trolling[3] that inspired the law at issue here – included "sophisticated cyber espionage and industrial-grade hacking." *See* Albright Decl. 5.

In March 2017, then-FBI Director James Comey revealed in testimony before the U.S. House of Representatives Permanent Select Committee on Intelligence that the FBI was investigating Russian efforts to interfere in the 2016 election. *In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 621 (D.D.C. 2018). Two months later, the Acting Attorney General appointed Robert S. Mueller III to serve as Special Counsel for the U.S. Department of Justice to investigate "(i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.04(a)." U.S. Dep't of Justice, Office of the Deputy Attorney Gen., Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017), https://www.justice.gov/opa/press-release/file/967231/ download. The special counsel's investigation, which remains ongoing, has yielded a multitude of criminal prosecutions, including two sets of grand jury indictments against alleged Russian operatives. *See* Indictment, *United States v. Netyksho*, No. 18-cr-215-ABJ (D.D.C. July 13, 2018), ECF No. 1; Indictment, *Internet Research Agency*, No. 18-cr-32-DLF.

---

[3] The word "troll" has taken on a new meaning in the age of social media. *See* Merriam-Webster, *Welcome to the New Words* (Sept. 2017), https://www.merriam-webster.com/words-at-play/new-words-in-the-dictionary-sep-2017 (announcing an expanded definition). In this context, the term means "to harass, criticize, or antagonize (someone) especially by provocatively disparaging or mocking public statements, postings, or acts." *See id.*

In the first of those cases, a grand jury on February 13, 2018, indicted three Russian companies and thirteen Russian nationals, linking them to an extensive campaign to conduct what participants allegedly described as "information warfare against the United States of America." Indictment at 6, *Internet Research Agency*, No. 18-cr-32-DLF.  The indictment accuses a St. Petersburg-based organization known as the Internet Research Agency of spending millions of dollars and employing hundreds of people to post divisive and inflammatory material on social media sites in 2015 and 2016.  *See id.* at 5.  Operatives allegedly created hundreds of phony accounts and group pages on Facebook, Instagram, Twitter, and other social media platforms.  *See id.* at 14-15.  As the U.S. presidential nominating contests were heating up, participants purportedly used these accounts to disparage candidates the Russian government disfavored, while promoting those it preferred.  *See id.* at 17.  Other posts encouraged members of minority groups, including African Americans and Muslims, to boycott the election or vote for a third-party candidate.  *See id.* at 18.

The indictment also asserts that, between April 2016 and November 2016, members of the Internet Research Agency, acting under assumed false identities, bought advertisements on "U.S. social media and other online sites expressly advocating for the election of then-candidate Trump and expressly opposing" his Democratic rival, former Secretary of State Hillary Clinton.  *See id.* at 19, 23.  Several of the advertisements the organization placed on Facebook promoted pro-Trump rallies it had planned.  *See id.* at 25, 27, 30.  The organization did not report its expenditures to the Federal Election Commission ("FEC").  *See id.* at 19.

A declaration included with Plaintiffs' reply brief in this case expands on the special counsel's assertions, filling in details about the Russian plot.  Jonathan Albright, director of the Digital Forensics Initiative at the Tow Center for Digital Journalism at the Columbia University

Graduate School of Journalism, explained that his research into foreign interference with the 2016 election has shown that the primary weapons in the Russian disinformation campaign were *unpaid* social media posts, rather than paid advertisements. *See* Albright Decl. 6.  For the most part, the operatives' posts made no explicit references to the election or to any particular candidates. *See id.* at 6-7.  More typically, the posts commented on controversial issues like race, gun rights, or immigration in hopes of stoking "outrage, fear, and frustration" among American social media users. *Id.* at 7.

Albright's research also identified a considerably smaller volume of foreign-sourced *paid* content. *See id.* at 7-8.  Most of this content – Albright uses the term "paid posts" – appeared on Facebook and Instagram, which offered a variety of tools and services featuring "sophisticated algorithms" that enabled clients to precisely target people who might be particularly receptive to their message. *Id.* at 8, 10; *see* Brennan Center Testimony 2, ECF No. 24, Ex. A.  For example, he says, Russian operatives used a Facebook tool known as Custom Audiences to deliver highly targeted messages to people who had visited misleading websites and Facebook pages the operatives had created. *See* Albright Decl. 8.[4]  As with the unpaid posts, these posts generally did not refer to any particular candidate for office, but rather sought to inflame social media users' passions on hot-button issues. *See id.* at 7; Brennan Center Testimony 2.  Some of the posts, according to Albright, "were completely unrelated to politics and seemingly used to collect personal information for future targeting and social engineering purposes."[5]  Albright Decl. 8.

---

[4] *See also* Elizabeth Dwoskin et al., *Russians Took a Page from Corporate America by Using Facebook Tool to ID and Influence Voters*, Wash. Post (Oct. 2, 2017), https://www.washington post.com/business/economy/russians-took-a-page-from-corporate-america-by-using-facebook-tool-to-id-and-influence-voters/2017/10/02/681e40d8-a7c5-11e7-850e-2bdd1236be5d_story. html?utm_term=.ac9c5084a797 (explaining Albright's findings).

[5] In this context, the phrase "social engineering" refers to the use of technology "to swindle people and manipulate them into disclosing passwords or bank information or granting access to their

Testimony by senior counsel for the Democracy Program at the Brennan Center for Justice during a Maryland House of Delegates committee hearing on the Act indicated that Russian operatives had Maryland residents, in particular, in their crosshairs during the run-up to the 2016 election. *See* Brennan Center Testimony 2. Counsel noted the operatives "targeted socially polarizing Facebook ads to the Baltimore area, which was experiencing mass protest movements and high tensions" at the time. *Id.* A transcript of counsel's testimony cited a news article quoting a congressman as stating that Russians targeted 262 ads to Marylanders during the election. *Id.* (citing Changez Ali & J.F. Meils, *GOP Senator: Maryland One of Three States Most Targeted by Russian Ads in 2016*, Delmarva Now (Nov. 2, 2017), https://www.delmarvanow.com/story/news/local/maryland/2017/11/02/maryland-russian-facebook-ads-campaign/826688001/). Many of these ads alluded to the Black Lives Matter movement and sought to stoke racial tensions. *See* Albright Decl. 7-8.

## B.

It was in February 2018, amid the uproar over Russian meddling in American political affairs, that Maryland legislators – noting an absence of any federal statutory or regulatory activity aimed at thwarting foreign interference in its elections – resolved to act and introduced the bill at issue here. While presenting the legislation in the House of Delegates, the bill's sponsors testified that its aim was to stop foreign powers – Russia, in particular – from interfering in Maryland elections in the future.[6] *See* Hearing on H.B. 981 Before the H. Comm. on Ways & Means, 438th

---

computer." Scott L. Schmookler & Christopher M. Kahler, *Social Engineering: Is the Manipulation of Humans a Computer Fraud?*, 22 Fidelity L.J., Nov. 2016, at 1, 4-5.

[6] A Brennan Center attorney, testifying in favor of the bill at the House committee meeting, said the bill was needed both to stymie Russian threats to the state's democratic processes and to combat attempts by other foreign governments and their nationals to funnel money to super PACs to influence state elections. *See* Hearing on H.B. 981 (statement of Democracy Program Senior

Sess. (Md. 2018) (statement of Del. Alonzo Washington) ("This bill is made to make sure that these types of acts do not happen here in the state of Maryland."), *available at* http://mgahouse.maryland.gov/mga/play/eb5126c2-5f0b-4512-a03cc37ce18e159c/?catalog/ 03e481c7-8a42-4438-a7da-93ff74bdaa4c; Sandy Rosenberg, *My Testimony – Unpolished*, DelSandy.com (Feb. 20, 2018), http://www.delsandy.com/2018/02/20/my-testimony-unpolished/ ("The bottom line here is, we need to act to address clear attempts to disturb[,] to destroy our political process . . . ."). The sponsor of a companion bill in the state Senate made a similar case while introducing that bill a few weeks later, decrying reports of foreign influence in the 2016 election and describing the legislation as a "first attempt to sort of unveil the iron curtain." Hearing on S.B. 875 Before the S. Comm. on Educ., Health & Envtl. Affairs, 438th Sess. (Md. 2018) (statement of Sen. Craig Zucker), *available at* http://mgahouse.maryland.gov/mga/play/0f183b99-dfef-4eb4-8dbe-b1f6369a3d56/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c.

The bill, as enacted, expands the scope of the state's existing campaign finance laws to cover online political ads. *See* 2018 Md. Laws 834. It does this, in part, by redefining the terms "public communication" and "electioneering communication," as they appear in Maryland's election laws, to include a limited subset of campaign materials that are posted for a fee on websites, social networks, search engines, or other online platforms. *See id.* (codified at Md. Code Ann., Elec. Law §§ 1-101(dd-1), (ll-1), 13-306(a)(6), -307(a)(3)). This change ensures that disclosure requirements the state long has imposed on purchasers of TV, radio, and print ads also apply to purchasers of online ads. *See* Elec. Law §§ 13-306(b)-(d), -307(b)-(d).

---

Counsel Daniel I. Weiner) (urging the House of Delegates to pass the bill on the ground that it "takes meaningful steps to address both of these problems").

The Act goes farther.   One section empowers the state administrator of elections to investigate potential violations of the laws governing online political ads.   *See id.* § 13-405.1. Another bars political ad buyers from using foreign currency to make their purchases.[7]   *See id.* § 13-405.2(b).

The Act's other revisions to the state's election law, which Plaintiffs challenge here, impose a series of duties on "online platforms" that feature paid political ads.   The Act defines "online platform" as

> any public-facing website, web application, or digital application, including a social network, ad network, or search engine, that:
> (1) has 100,000 or more unique monthly United States visitors or users for a majority of months during the immediately preceding 12 months; and
> (2) receives payment for qualifying paid digital communications.

*Id.* § 1-101(dd-1).  For sites that come within this definition, the Act imposes what essentially boils down to two requirements.   The first, which I will refer to as the "publication requirement," obligates the online platform to post information about political ads on the platform's own website. *See id.* § 13-405(b).  The second, which I will call the "state inspection requirement," imposes on the platform a duty to keep records in connection with each qualifying ad and make them available to the State Board of Elections upon request.  *See id.* § 13-405(c).

The publication requirement is found in section 13-405(b) of the Maryland Election Law. Under this provision, an online platform that agrees to place a "qualifying paid digital

---

[7] Plaintiffs assert that the currency restriction is itself an unconstitutional restraint on speech. *See* Compl. ¶¶ 69-71, ECF No. 1; Pls.' Mem. 22 n.15, ECF No. 9-1. However, neither the Complaint nor the memorandum in support of the motion for preliminary injunctive relief cites any authority for this contention.  Plaintiffs have not explained how this restriction trenches on their free speech rights, given the ready availability of currency conversion services.  While I cannot rule out the possibility that Plaintiffs' argument might succeed on the merits on summary judgment or at trial, I am not persuaded that Plaintiffs have met their burden at this stage of the proceedings. Accordingly, the request to preliminarily enjoin enforcement of section 13-405.2 is denied.

communication"[8] (which, for the sake of simplicity, I will refer to as an online "political ad," or just "ad") must compile information about the transaction, which, as a general matter, must include the buyer's identity and the total amount paid for the ad. *See id.* § 13-405(b)(6)(i)-(ii). The platform must post this information, in a searchable format, within 48 hours of the purchase,[9] placing it "in a clearly identifiable location on the online platform's website." *Id.* § 13-405(b)(1)-(3). The information must remain on the platform's site for at least one year after the general election to which it relates. *See id.* § 13-405(b)(3)(ii).

The state inspection requirement, found in section 13-405(c), imposes separate record-keeping obligations. Here, the platform must preserve a digital copy of the ad and maintain records containing the following information:

> (i) the candidate or ballot issue to which the [ad] relates and whether [it] supports or opposes that candidate or ballot issue;
> (ii) the dates and times that the [ad] was first disseminated and last disseminated;
> . . .
> (iv) an approximate description of the geographic locations where the [ad] was disseminated;
> (v) an approximate description of the audience that received or was targeted to receive the [ad]; and
> (vi) the total number of impressions generated by the [ad].

*Id.* § 13-405(c)(3). These records must be maintained for one year after the general election and must be turned over to the State Board "on request." *Id.* § 13-405(c)(1)-(2).

---

[8] The statute defines "qualifying paid digital communication" as "any electronic communication that: (1) is campaign material; (2) is placed or promoted for a fee on an online platform; (3) is disseminated to 500 or more individuals; and (4) does not propose a commercial transaction." Elec. Law § 1-101(ll-1).

[9] Platforms that can demonstrate that the 48-hour publication requirement "presents an unreasonable burden" may seek a compliance waiver from the State Board of Elections. Elec. Law § 13-405(b)(5).

The publication requirement and state inspection requirement are functionally distinct, but they operate as part of a single scheme. To facilitate compliance with both obligations, the Act requires online platforms to provide ad buyers with a way of notifying them when an ad they are seeking to place comes within the statutory definition of a "qualifying paid digital communication." *See id.* § 13-405(a)(3). The Act puts the onus on ad buyers to provide the notice to the platform at the time they place the ad, *see id.* § 13-405(a)(1), and to supply the platform with the information it will need to comply with both the publication requirement and the state inspection requirement,[10] *see id.* § 13-405(d)(1). The platform does not incur any duties to publish information on its website or make records available for state inspection unless and until the buyer provides the notice. *See id.* § 13-305(b)(1), (c)(1).

The Act took effect on July 1, 2018. *See* 2018 Md. Laws 834, § 2. Governor Larry Hogan allowed the bill to become law without his signature. *See* Letter from Governor Larry Hogan to S. President Thomas V. Mike Miller Jr. & H. Speaker Michael E. Busch (May 25, 2018), *available at* https://governor.maryland.gov/wp-content/uploads/2018/05/EWS-HB981-SB875-Online-Electioneering.pdf. A statement he issued on the eve of the bill's enactment explained that, while he found the bill's goals laudable, he had "serious" concerns about its constitutionality and had reservations about the prospect of "coerc[ing] news outlets protected by the First Amendment to publish certain material." *Id.*

### C.

Plaintiffs[11] – a coalition of Maryland- and Washington, D.C.-based newspapers and a regional press association – brought this suit in August 2018, seeking a preliminary injunction to

---

[10] The platform "may rely in good faith on the information" the buyer provides. *Id.* § 13-405(d)(2).
[11] Plaintiffs are: the Washington Post; Baltimore Sun Co., LLC; Capital-Gazette Communications, LLC; Carroll County Times, LLC; APG Media of Chesapeake, LLC; Community Newspaper

block enforcement of certain portions of the Act roughly three months ahead of the 2018 general elections. *See* Compl., ECF No. 1; Mot. for Prelim. Inj., ECF No. 9. Commendably, the parties soon afterward entered into a memorandum of understanding, in which the State agreed it would not require Plaintiffs to comply with the new law before the Court rules on the motion for preliminary injunction. *See* ECF No. 18.

Plaintiffs' motion raises several constitutional arguments. Chiefly, it argues that Md. Code Ann., Elec. Law § 13-405 – the portion of the law that compels online publishers to publish information on their websites and make records available to the state – violates the First and Fourteenth Amendment guarantees of free speech and press, both facially and as applied to Plaintiffs.[12]   *See* Pls.' Mem. 2, ECF No. 9-1.   Plaintiffs also argue this provision is unconstitutionally vague and that it authorizes an unconstitutional seizure of papers in violation of the Fourth Amendment. *See id.* Finally, they assert the Act is preempted by the Communications Decency Act of 1996, 47 U.S.C. § 230. *See id.*

The parties have fully briefed the motion and presented arguments at a hearing on November 16, 2018.[13]   *See* ECF Nos. 9, 9-1, 24, 31, 37.

## DISCUSSION

A preliminary injunction serves to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful

---

Holdings, Inc.; Ogden Newspapers of Maryland, LLC; Schurz Communications, Inc.; and Maryland-Delaware-D.C. Press Association, Inc.

[12] Plaintiffs also seek to enjoin the State from enforcing § 13-405.1, which authorizes the state administrator of elections to investigate potential violations of § 13-401 and § 13-405.  See Md. Code Ann., Elec. Law § 13-405.1(a).

[13] The Campaign Legal Center and Common Cause Maryland submitted a brief as *amici curiae* in support of the State and appeared (at the Court's request) at the November motions hearing. *See* ECF No. 28. I appreciate the skillful written and oral presentations of counsel for the parties and *amici*, as well as their professionalism in their dealings with each other.

judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003); *see Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). As a preliminary injunction is an "extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

*Winter v. Natural Resources Defense Council, Inc.* establishes the familiar requirements for a preliminary injunction. Under *Winter*, the plaintiff must show "that [1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of equities tips in his favor, and [4] an injunction is in the public interest." *Id.* at 20; *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). The Court may grant the motion "only if the moving party clearly establishes entitlement to the relief sought." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

### A.

In reviewing a motion for preliminary injunction, a court must separately consider each of the four *Winter* factors. *See Di Biase*, 872 F.3d at 230. I begin, accordingly, with the matter of Plaintiffs' likelihood of succeeding on the merits.

"A plaintiff need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed at trial." *Id.* (quoting *Pashby*, 709 F.3d at 321). Here, because I conclude that Plaintiffs are likely to succeed on their claim that portions of the Act violate their First and Fourteenth Amendment rights of free speech and freedom of the press, I need only address this issue for purposes of evaluating their likelihood of prevailing on the merits.

### 1.

The dispute over the Act's constitutionality underscores the tension between two competing interests in Free Speech Clause jurisprudence. The first and most readily apparent of

these is, of course, the individual's interest in free expression – i.e., the speaker's interest in speaking. The other is the broader public's interest in minimizing the societal harms that would be all but certain to flow from an absolute, unchecked right to say anything at any time, in any place, and in any manner the speaker so desires. *See* Thomas I. Emerson, *Toward a Theory of the First Amendment*, 72 Yale L.J. 877, 907-08 (1963).

The text of the Free Speech Clause unequivocally protects the first of these interests, declaring in no uncertain terms that Congress "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. It is long since settled, though, that the Clause does not strip the government of all power to regulate speech. *See Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 482 (2007); *Konigsberg v. State Bar of Calif.*, 366 U.S. 36, 49-50 & n.10 (1961). The modes of analysis courts have employed in their efforts to identify the limits of governmental authority in this arena have evolved over time, maturing into the doctrinal, category-based approach courts employ today. *See* Richard H. Fallon Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1274-85 (2007); Note, *Free Speech Doctrine After* Reed v. Town of Gilbert, 129 Harv. L. Rev. 1981, 1982 (2016). This approach requires courts to distinguish among speech-suppressing regulations much the same way a biologist distinguishes among organisms, identifying their most distinctive features and slotting each new species into its proper genus.

To guide lower courts in this exercise, the Supreme Court has propounded several baseline principles, three of which come into play in this case. First, the Court has observed that the Free Speech Clause aims, above all else, to guarantee the "free debate and free exchange of ideas" necessary to ensure "that government remains responsive to the will of the people." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). It is for this reason, chiefly, that political speech is entitled to the highest degree of constitutional protection. *See Burson v. Freeman*, 504 U.S. 191,

196 (1992) ("[T]his Court has recognized that 'the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.'" (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989))); *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (stating that regulations of speech relating to the electoral process "trench[] upon an area in which the importance of First Amendment protections is at its zenith" (quotation omitted)); *see also Wis. Right to Life, Inc.*, 551 U.S. at 503 (Scalia, J., concurring in part and concurring in judgment) ("It is perhaps [the Supreme Court's] most important task to ensure freedom of political speech."); *Lawson v. Union Cty. Clerk of Court*, 828 F.3d 239, 264 (4th Cir. 2016). As a practical matter, this means that laws burdening political speech are subject to strict scrutiny, which requires the government to "prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (quoting *Wis. Right to Life*, 551 U.S. at 464).

Second, it is a fundamental tenet of First Amendment jurisprudence that the government "has no power to restrict expression because of its message, its ideas, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)). The Court reaffirmed this principle only a few years ago in *Reed v. Town of Gilbert*, explaining that content-based regulations – i.e., those that distinguish among different types of speech on the basis of their communicative content – are highly suspect and "presumptively unconstitutional." 135 S. Ct. 2218, 2226 (2015). The test for these regulations mirrors the test for laws that burden political speech, in that both are subject to strict scrutiny. *See id.*; *Cent. Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016); *Cahaly v. Larosa*, 796 F.3d 399, 402 (4th Cir. 2015).

Finally, the Court has left no doubt that the First Amendment cabins the government's power to *compel* speech no less than it does the power to *restrict* speech. *See Janus v. Am. Fed'n of State, Cty. & Mun. Emps. Council 31*, 138 S. Ct. 2448, 2463 (2018) ("We have held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977))); *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("[F]reedom of speech prohibits the government from telling people what they must say."); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" (quoting *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 11 (1986) (plurality opinion))); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 559 (1985). This understanding of the Free Speech Clause reflects a recognition that requiring a speaker to disseminate a message that is not his own may, in fact, deter him from speaking at all, "thereby reducing the free flow of information and ideas that the First Amendment seeks to promote." *Pac. Gas & Elec.*, 475 U.S. at 14.

This last concept intersects with the second, as any law that compels speech "necessarily alters the content of the speech." *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). It follows, then, that laws compelling speech are treated as content-based and are subject to strict scrutiny. *See id.*; *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013); *Stuart v. Loomis*, 992 F. Supp. 2d 585, 592-93 (M.D.N.C. 2014).

## 2.

These three principles lay the foundation for my analysis here. The first is plainly implicated because the Maryland statute regulates electioneering communications – indisputably a form of political speech. *See Wis. Right to Life*, 551 U.S. at 481; *Ctr. For Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 285 (4th Cir. 2013). The applicability of the second and third principles is equally evident. The statute singles out campaign-related content for regulation – as patent a case of content discrimination as there could be – and compels online publishers to retain records, make information available upon request, and publish content on their websites. *See* Md. Code Ann., Elec. Law § 13-405(b)-(c). These considerations all point in the same direction, signaling Plaintiffs are correct in asserting that, on summary judgment or at trial, the State would bear the heavy burden of demonstrating the Maryland statute overcomes strict scrutiny.

But this is far from the end of the matter, because as the State rightly notes, the field of First Amendment case law is fertile with exceptions to the various fundamental rules. *See Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014). There are, of course, the traditional limitations on First Amendment protection for speech that is said to be "of such slight social value as a step to truth that any benefit that may be derived from [it] is clearly outweighed by the social interest in order and morality." *R.A.V. v. City of Saint Paul, Minn.*, 505 U.S. 377, 382 (1992) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). These areas of speech include obscenity, defamation, fraud, incitement, and "speech integral to criminal conduct," *United States v. Stevens*, 559 U.S. 460, 468-69 (2010), as well as fighting words, "true threats," and "pornography produced with real children," *Virginia v. Black*, 538 U.S. 343, 359 (2003); *see Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245-46 (2002). While it is sometimes said that these areas of speech fall outside the scope of the First Amendment, the Court has explained that

pronouncements to that effect are not "literally true." *R.A.V.*, 505 U.S. at 383. Rather, it would be more accurate to say that states may regulate these areas of speech "because of their constitutionally proscribable content" but cannot make them "vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.*

The First Amendment is more protective of another category of speech – namely, commercial speech – but here, too, the Court has seen fit to give the government extra leeway. *See Janus*, 138 S. Ct. at 2464-65; *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 426 & n.21 (1993) (explaining that the "interest in preventing commercial harms justifies more intensive regulation of commercial speech than noncommercial speech"). In *Florida Bar v. Went for It, Inc.*, the Court noted it has "always been careful to distinguish commercial speech from speech at the First Amendment's core," explaining that commercial speech "enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values." 515 U.S. 618, 623 (1995) (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989)). In this area, the constitutional test is mere "intermediate" scrutiny. *See id.*; *Walraven v. N.C. Bd. of Chiropractic Exam'rs*, 273 F. App'x 220, 223-24 (4th Cir. 2008).

The general principle that content-based regulations of speech are presumptively unconstitutional gives way in other contexts as well. *See generally* Matthew D. Bunker et al., *Strict in Theory, but Feeble in Fact? First Amendment Strict Scrutiny and the Protection of Speech*, 16 Comm. L. & Pol'y 349, 362-63 (2011). For example, the Court has recognized that the government's responsibilities as an administrator and service provider may require a freer hand to regulate speech by people in its care or custody, such as public school students or prisoners. *See Morse v. Frederick*, 551 U.S. 393, 404-05 (2007); *Turner v. Safley*, 482 U.S. 78, 89 (1987). Similarly, the Court has given the government some latitude in regulating the words and actions

of military service members, *see Parker v. Levy*, 417 U.S. 733, 758 (1974), and of public employees making statements pursuant to their official responsibilities, *see Lane v. Franks*, 573 U.S. 228, 235-37 (2014). These precedents, the Court has said, stand "for the proposition that there are certain governmental functions that cannot operate without some restrictions on particular kinds of speech." *Citizens United*, 558 U.S. at 341.

Along similar lines, the Court has carved out special rules for broadcast media, reasoning that the finite supply of broadcast frequencies justifies "some adjustment in traditional First Amendment analysis to permit the Government to place limited content restraints, and impose certain affirmative obligations, on broadcast licensees." *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 637-38 (1994); *see Red Lion Broad. v. Fed. Commc'ns Comm'n*, 395 U.S. 367, 386-90 (1969). This rationale, the Court has made clear, is particular to broadcast communications and does not apply to cable transmissions or material posted on the Internet. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 868-70 (1997); *Turner*, 512 U.S. at 639.

Each of these lines of cases marks a limited exception to the baseline principles controlling the constitutional review of content-based laws and regulations (including those that compel speech). Here, the State invokes a separate line of cases presenting yet another exception to the rule. Its argument, in brief, is that the Maryland statute is, in effect, a campaign finance disclosure law and ought to be reviewed under a less-demanding standard the Court has specially reserved for those cases, a standard known as "exacting scrutiny." What follows is a brief synopsis of this line of cases.

### 3.

The seminal campaign finance case is *Buckley v. Valeo*, which observed, as a preliminary matter, that the Constitution empowers Congress to regulate federal elections. 424 U.S. 1, 13 (1976) (per curiam) (citing U.S. Const. art. I, § 4). There is no question that states enjoy comparable powers when it comes to overseeing and administering state elections, *see Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections."); *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 281 (4th Cir. 2008), in addition to their constitutionally enshrined power to prescribe the times, places, and manner of holding elections for the U.S. House and Senate, U.S. Const. art. I, § 4, cl. 1. These powers are essential in ensuring that elections "are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. It is inevitable, though, that in exercising its authority, the government will impose burdens of one kind or another on participants in the election process, be they candidates, campaign committees, political action committees, ballot initiative petitioners, or voters. "The *Buckley* Court therefore recognized the need to cabin legislative authority over elections in a manner that sufficiently safeguards vital" constitutional rights, including the First Amendment's guarantee of free speech. *Leake*, 525 F.3d at 281.

*Buckley* established the standards that courts apply in cases challenging campaign finance regulations on First Amendment grounds. In doing so, the Court drew distinctions between different types of regulations "based on the degree to which each encroaches upon protected First Amendment interests." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 196-97 (2014) (discussing *Buckley*); *see Indep. Inst. v. Williams*, 812 F.3d 787, 791-92 (10th Cir. 2016). *Buckley* first explained that regulations restricting the amount of money a person or group can spend on political communications during a campaign are especially problematic because "virtually every

means of communicating ideas in today's mass society requires the expenditure of money." 424

U.S. at 19. Spending limits, the Court stated, are sure to reduce "the quantity of expression by

restricting the number of issues discussed, the depth of their exploration, and the size of the

audience reached." *Id.* Accordingly, the Court held that the constitutionality of a spending

limitation "turns on whether the governmental interests advanced in its support satisfy the exacting

scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at

44-45. The Court has since clarified that the phrase "exacting scrutiny,"[14] as applied to spending

restrictions in political campaigns, was synonymous with "strict scrutiny," requiring the

government to demonstrate the restriction "promotes a compelling interest and is the least

restrictive means to further the articulated interest." *McCutcheon*, 572 U.S. at 196-97; *see also*

*Indep. Inst.*, 812 F.3d at 791-92.

By contrast, the *Buckley* Court found that contribution limits – i.e., regulations limiting the

amount of money a person or group may *contribute* to a candidate or political committee – were

less worrisome, reasoning that these types of regulations entail "only a marginal restriction upon

---

[14] The Court's application of the phrase "exacting scrutiny" has not always been exacting in its
own right, leading to considerable confusion. Scholars have noted the Court has at times used
"exacting scrutiny" and "strict scrutiny" interchangeably. *See* Recent Case, *Minn. Citizens
Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) (en banc), 126 Harv. L. Rev.
1715, 1720-21 (2013); *see, e.g.*, *McCutcheon*, 572 U.S. at 197 (defining "exacting scrutiny" in a
way that mirrors the familiar test for strict scrutiny); *Burson*, 504 U.S. at 198 (same); *see also
McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("When a law burdens core political
speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored
to serve an overriding state interest."). As I will shortly explain, though, however confusingly the
Court has used "exacting scrutiny" in other contexts, it is understood that the term has a meaning
all its own in the context of campaign finance disclosure requirements. *See John Doe No. 1 v.
Reed*, 561 U.S. 186, 196 (2010); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th
Cir. 2010). In this context, the term connotes a standard of constitutional review that is less
rigorous than strict scrutiny, one that simply requires the government to show "a 'substantial
relation' between the disclosure requirement and a 'sufficiently important' governmental interest."
*John Doe No. 1*, 561 U.S. at 196 (quoting *Citizens United*, 558 U.S. at 366-67).

the contributor's ability to engage in free communication." 424 U.S. at 20.  While *Buckley* did not precisely articulate a standard for reviewing the constitutionality of contribution limits, *see Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 386 (2000) ("Precision about the relative rigor of the standard to review contribution limits was not a pretense of the *Buckley* per curiam opinion."), subsequent cases subjected these types of restrictions to a kind of intermediate scrutiny.  Under this standard, an across-the-board contribution limitation "cannot stand unless [it] is 'closely drawn' to serve a 'sufficiently important interest,' such as preventing corruption and the appearance of corruption." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 737 (2008); *see also Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 466 (2001).

The last – and, for present purposes, most relevant – variety of campaign finance regulation the *Buckley* Court addressed was arguably the least constitutionally suspect: disclosure requirements. *See Buckley*, 424 U.S. at 64; *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1003 (9th Cir. 2010).  To be sure, *Buckley* did not view these laws as constitutionally benign; rather, it recognized that laws compelling disclosure can, at times, "seriously infringe on privacy of association and belief guaranteed by the First Amendment." 424 U.S. at 64.  By way of example, the Court cited *National Association for the Advancement of Colored People v. Alabama*, 357 U.S. 449 (1958), which overturned a state court order that sought to compel a local chapter of the NAACP to reveal its members' names and addresses.  There, the Court concluded the state's interest in disclosure did not justify the harm to the organization's members' rights, given the likelihood the production requirement would induce some NAACP members to withdraw from the group and would discourage others from joining in the first place, for fear of the consequences that might accompany the exposure of their beliefs. 357 U.S. at 462-65.

Turning to the statute before it, the *Buckley* Court observed that, in the campaign finance context, disclosure requirements have the potential to deter some people from making contributions and could, under some circumstances, "expose contributors to harassment or retaliation." 424 U.S. at 68. At the same time, though, the Court acknowledged that "there are governmental interests sufficiently important to outweigh the possibility of infringement, particularly when the 'free functioning of our national institutions' is involved." *Id.* (quoting *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 97 (1961)). The Court identified three such interests: providing the electorate with information about campaign funding and expenditures; deterring corruption and the appearance of corruption; and helping the state gather data necessary to detect violations of campaign finance laws. *See id.* at 66-68. Disclosure requirements, the Court concluded, not only serve these interests but, in "most" cases, "appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption." *Id.* at 68.

The test that emerged from *Buckley*, which has come to be known as "exacting scrutiny," requires the government to show the record-keeping, reporting, or disclosure provisions of a campaign finance law are "substantially related" to an "important" government interest. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010); *Citizens United*, 558 U.S. at 366-67 (citing *Buckley*, 424 U.S. at 64, 66); *Buckley v. Am. Constitutional Law Found.* (ACLF), 525 U.S. 182, 202 (1999); *Tennant*, 706 F.3d at 282; *Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544, 549 (4th Cir. 2012); *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 735 (2011).

The Supreme Court has applied the *Buckley* "exacting scrutiny" test on five occasions.[15] Three of those cases featured facial or as-applied challenges to disclaimer or disclosure requirements in federal campaign finance laws. In *Buckley* itself, the first of those three cases, the Court rejected an argument that provisions requiring candidates and political committees to file detailed financial reports identifying contributors were overbroad "both in their application to minor-party and independent candidates and in their extension to contributions as small as $11 or $101." 424 U.S. at 60-61, 68-74. Applying the same standard, the Court likewise upheld a provision requiring individuals or groups who contributed or spent more than $100 in a calendar year to file a statement with the FEC. *See id.* at 74-84.

The *Buckley* test reappeared decades later in *Davis v. Federal Election Commission*, 554 U.S. 724 (2008), a case that tested the facial constitutionality of the federal "Millionaire's Amendment," which sought to bridge the fundraising gap in races where one candidate was spending large sums of his or her own money. After concluding the Millionaire's Amendment failed strict scrutiny, the Court considered the constitutionality of an accompanying provision that required self-financing candidates to make certain disclosures in connection with the Amendment. *See* 554 U.S. at 744. Citing to *Buckley*, the Court concluded – without much discussion – that the disclosure requirement was unjustifiable because the law it was designed to implement was itself unconstitutional. *See id.*

Two years later, in *Citizens United v. Federal Election Commission*, the Court applied exacting scrutiny in upholding a requirement that political ads on TV carry a disclaimer identifying

---

[15] The Court invoked *Buckley* in the course of reviewing a federal campaign finance disclosure requirement in a sixth case, *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), *overruled in part on other grounds*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), but the majority opinion does not explicitly articulate the standard of scrutiny it is applying. *See* 540 U.S. at 194-202.

the individual or group responsible for the ad, as well as a provision requiring anyone spending more than $10,000 on electioneering communications within a year to file a disclosure statement with the FEC. 558 U.S. at 366-67.

The remaining two cases dealt with state ballot initiatives. In *Buckley v. American Constitutional Law Foundation, Inc.* (ACLF), the Court struck down a Colorado statutory provision requiring ballot-initiative proponents who employ paid circulators to file reports disclosing not only the proponents' identities but the circulators' names and addresses and the total amount paid to each circulator. 525 U.S. at 204. The Court reasoned that requiring the disclosure of the circulators' identities and the amount they were paid was not substantially related to the state's interest in curbing the influence of affluent special interest groups or deterring corruption. *See id.* at 202-04. By contrast, in *John Doe No. 1 v. Reed*, the Court held the state of Washington did not violate the First Amendment in requiring people who signed a referendum petition to reveal their names and addresses. 561 U.S. 186, 202 (2010). The Court concluded the requirement withstood exacting scrutiny, noting the state's strong interest in ensuring the integrity, transparency, and accountability of its electoral process. *See id.* at 197-99.

Here, the parties and *amici* have identified twelve federal appellate court decisions applying the *Buckley* exacting scrutiny standard.[16] Critically, all of these cases addressed the

---

[16] *See Indep. Inst.*, 812 F.3d 787 (rejecting a non-profit group's challenge to a Colorado state constitution provision requiring anyone who spends at least $1,000 per year on "electioneering communications" to make certain disclosures); *Del. Strong Families v. Attorney Gen. of Del.*, 793 F.3d 304 (3d Cir. 2015) (rejecting a group's as-applied challenge to a Delaware campaign finance law requiring groups that spend at least $500 on "electioneering communications" to file a report with the state); *Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014) (upholding a state statute imposing disclosure requirements on political committees and individuals who receive or spend money in connection with a ballot initiative to amend the state constitution); *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118 (2d Cir. 2014) (rejecting a nonprofit group's challenge to disclosure provisions in Vermont election law); *Worley v. Fla. Sec'y of State*, 717 F.3d 1238 (11th Cir. 2013) (upholding provisions of Florida campaign finance law requiring political committees

constitutionality of laws or regulations (or, in the Tenth Circuit case, a state constitutional provision) requiring candidates, campaigns, political committees, or donors to make certain disclosures in connection with election activities. In none of these cases did the challenged statute impose disclosure obligations on third-party media outlets or other publishers of election-related advertisements.

**4.**

To review, the State does not dispute that the statute at issue here implicates political speech and discriminates on the basis of content – two factors that, ordinarily, saddle the government with the burden of overcoming strict scrutiny. *See Reed*, 135 S. Ct. at 2226; *Citizens United*, 558 U.S. at 340. The State's argument, in brief, is that those bedrock principles do not apply here because *Buckley* and its progeny supply a different standard for election-related disclosure requirements.

The Maryland statute is indisputably unlike the various statutes the Supreme Court and federal courts of appeals have reviewed under the *Buckley* exacting scrutiny standard. In each of those cases, the challenged regulations imposed burdens on individuals or groups seeking to

---

to disclose contributions and expenses and to identify themselves in their ads); *Tennant*, 706 F.3d 270 (holding that certain elements of the definition of "electioneering communication" in a West Virginia campaign finance statute did not survive exacting scrutiny but that the statute's reporting requirements were constitutional); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) (rejecting a nonprofit group's arguments that an Illinois campaign finance statute's disclosure requirements were facially vague and overbroad); *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) (en banc) (striking down provisions of Minnesota campaign finance and public disclosure laws requiring associations to comply with certain organizational, record-keeping, and reporting requirements); *Real Truth About Abortion*, 681 F.3d 544 (holding that FEC disclosure requirements survive exacting scrutiny); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011) (upholding Maine election laws imposing disclosure requirements on political committees and people or entities who make independent expenditures to influence an election); *Brumsickle*, 624 F.3d 990 (rejecting a facial and as-applied challenge to disclosure provisions of Washington campaign finance law); *SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010) (en banc) (rejecting a nonprofit group's as-applied challenge to organizational, administrative, and reporting requirements in federal election law).

26

influence an election or ballot question—the direct participants in the electoral process. They did not burden ostensibly neutral third parties such as publishers of political advertisements, as the Maryland statute does.

To this, the State offers two replies. First, it argues that "nothing in *Citizens United* or its forebears supports" Plaintiffs' inference that exacting scrutiny applies only to disclosure requirements burdening "*speakers* of election-related speech." Defs.' Opp'n 16-17 (emphasis in original) (quoting Pls.' Mem. 17). Second, it suggests the *Buckley* rationale applies no less forcefully to regulations burdening the press than to those that burden political actors directly. I address each of these arguments below.

i.

The State's first argument is hardly persuasive. A court cannot be expected to answer a legal question that no party in the case before it has squarely presented. *See* U.S. Const. art. III, § 2; *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974). If there is a dearth of case law addressing a state's power to compel the press to disclose information about the political ads they publish, it is not because the state's power is unquestioned, but rather because few states have exercised it, as Maryland now has.

That said, it is simply not true that no court has examined a regulation that compelled media outlets to make disclosures in connection with political advertisements. None other than the Supreme Court did just that in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), *overruled in part on other grounds*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). The statutory provision in that case, it must be said, was meaningfully distinct from Maryland's law, in that its obligations fell exclusively on broadcasters, who have historically been subjected

to heavier governmental regulation. 540 U.S. at 233-46. Nevertheless, the Court's analysis is instructive, and, in my view, it undercuts the State's position here.

This particular portion of the *McConnell* Court's opinion concerned Title V of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which amended the Communications Act of 1934 to require broadcast licensees to collect and disclose records of ad purchases relating to a candidacy or, beyond that, "political matters of national importance." *McConnell v. Fed. Election Comm'n*, 251 F. Supp. 2d 176, 220 (D.D.C. 2003) (per curiam), *aff'd in part and rev'd in part*, 540 U.S. 93 (2003), *overruled in part on other grounds*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). At an earlier stage of the litigation, all three judges on the district court panel treated the provision as an ordinary "law compelling disclosure of campaign information" and applied *Buckley*'s "exacting scrutiny" test. *Id.* at 811 (Leon, J.); *see id.* at 381 (Henderson, J., concurring in judgment in part and dissenting in part). The panel struck down the provision, with two of the three judges reasoning that the government had not shown the provision served any of the state interests the *Buckley* Court had enumerated, particularly given that federal law already required ad purchasers to disclose much of the same information. *Id.* at 811-13 (Leon, J.).

The Supreme Court reversed. *McConnell*, 540 U.S. at 246. Justice Breyer's opinion, on behalf of a five-member majority, could have been clearer in articulating the standard that it applied. I note, though, that while the opinion does not include a single citation to *Buckley* or any other cases applying the "exacting scrutiny" standard, it twice invokes *Red Lion Broadcasting Co. v. Fed. Commc'ns Comm'n*, 395 U.S. 367 (1969), one of the leading cases establishing that regulations of broadcast media (e.g., non-cable television or radio) receive a lower level of First Amendment scrutiny than other laws burdening speech. *See McConnell*, 540 U.S. at 237 (citing *Red Lion*, 395 U.S. at 380). The *McConnell* majority's opinion echoes *Red Lion* in explaining that

28

the challenged regulations were in keeping with a long history of federal regulations of broadcast media. *See id.* at 234-38; *Red Lion*, 395 U.S. at 369 (noting the fairness doctrine, at issue in that case, "originated very early in the history of broadcasting and has maintained its present outlines for some time," courtesy of a "long series of FCC rulings"). The majority's deference to the FCC was sufficiently pronounced that Chief Justice Rehnquist, in dissent, accused the Court of approaching the provision "almost exclusively from the perspective of the broadcast licensees, ignoring the interests of candidates and other purchasers, whose speech and association rights are affected." *McConnell*, 540 U.S. at 359 (Rehnquist, C.J., dissenting).

The *McConnell* majority could have declared, as both the Chief Justice's dissent and the lower court panel did, that *Buckley*'s "exacting scrutiny" standard applied to Title V's disclosure requirements. It did not. While the majority's opinion leaves unclear exactly which standard of constitutional scrutiny controlled in that case,[17] its intense focus on the history and particularities of broadcast media regulations is more consistent with the line of broadcast-specific cases that followed *Red Lion* than with the line of campaign finance cases that followed *Buckley*. This, it seems to me, cuts against the State's view that the First Amendment treats all election-related disclosure requirements alike, with no consideration for whether the law at issue regulates political speakers or third-party media outlets.

## ii.

The State's second argument looks to *Buckley* itself, suggesting its rationale applies to laws like Maryland's no less forcefully than it does to more traditional campaign finance disclosure

---

[17] In the end, the majority appears to suggest it made no difference which standard applied, because "[g]iven the FCC regulations and their history, the statutory [disclosure] requirements must survive a facial attack under any potentially applicable First Amendment standard, including that of heightened scrutiny." *McConnell*, 540 U.S. at 245.

laws that impose no burdens on the press or other third parties. *See* Defs.' Opp'n 16. Under either regime, the State argues, the disclosure requirement serves the same governmental interest of "'providing the electorate with information' about sources of election-related spending." *Id.* at 17 (alteration omitted) (quoting *Buckley*, 424 U.S. at 66). The strength of that interest, it asserts, "does not depend on whether the person required to make the disclosure is the person who made the expenditure or who received it." *Id.*

This argument, as I see it, makes the mistake of viewing the government's interest in isolation from the speaker's interest. It may well be true that the public benefits equally from information about candidates' finances no matter where the information is sourced, be it from the political committees themselves or from the press. It does not follow, though, that as a matter of constitutional law it makes no difference which route the government takes.

The Supreme Court's analysis in *Buckley* began with the premise that campaign finance regulations intrude on political expression, which is entitled to "the broadest" First Amendment protection. 424 U.S. at 14. When, in the course of its *per curiam* opinion, the Court drew distinctions among the three strains of regulations in that case (namely, spending limits, contribution limits, and disclosure requirements), it did not base these distinctions on the strength of the government's interest. Rather, as the Court later explained in *McCutcheon v. Federal Election Commission*, the distinctions were "based on the degree to which each [type of regulation] encroaches upon protected First Amendment interests." 572 U.S. at 196-97. The less onerous test for disclosure requirements reflects the *Buckley* Court's view that these sorts of regulations, unlike aggregate limits on spending or contributions, "impose no ceiling on campaign-related activities," 424 U.S. at 64, and are often "the least restrictive means" of keeping the public informed and deterring corruption, *id.* at 68.

30

The flaw in the State's argument here is that it overlooks the possibility that statutes like Maryland's might encroach on First Amendment rights more profoundly than ordinary campaign finance disclosure requirements. This is an error, because to my mind, it is evident that they do. All compelled disclosure laws implicate the Free Speech Clause, but laws imposing those burdens on the media implicate a separate First Amendment right as well: the freedom of the press. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom . . . of the press . . . ."). "[L]aws that single out the press, or certain elements thereof, for special treatment 'pose a particular danger of abuse by the State' . . . ." *Turner Broad Sys.*, 512 U.S. at 640 (quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987)). Such regulations evoke a concern that government may wield its authority "as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983). The State's argument in this case sweeps these concerns aside, as if the superficial similarities between its statute and more typical disclosure laws were all that mattered.

### iii.

It should be clear by now that, when analyzing the constitutionality of a compelled disclosure law, *Buckley* is not the starting point. The "exacting scrutiny" standard it propounded is, on the contrary, a limited exception to the general rule that compelled disclosure laws, like all content-based regulations, must overcome strict scrutiny. *See Reed*, 135 S. Ct. at 2226. What the State is seeking to do here, at bottom, is to expand *Buckley* to cover a wider array of regulations than the doctrine has previously encompassed. Recent Supreme Court precedents, though,

strongly suggest that courts should view those exceptions narrowly. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018).

Reed v. Town of Gilbert was a watershed First Amendment case, refining the analysis of content-based regulations and cementing the primacy of the rule that such regulations receive strict scrutiny. *See Free Speech Coal., Inc. v. Attorney Gen.*, 825 F.3d 149, 160 n.7 (3d Cir. 2016) ("*Reed* represents a drastic change in First Amendment jurisprudence."); *Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412-13 (7th Cir. 2015) (explaining that *Reed* "effectively abolishes any distinction between content regulation and subject-matter regulation). *Reed* declares, without qualification, that "[c]ontent-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." 135 S. Ct. at 2226.

Justice Thomas's majority opinion in *Reed* did not allude to the various species of regulations that have historically received less rigorous scrutiny, even where they plainly discriminate on the basis of content. *See id.* at 2235 (Breyer, J., concurring in the judgment) (asserting the majority's approach does not square with the "many subcategories and exceptions" the Court had previously recognized, including its holdings on commercial speech and government speech). The prevailing consensus appears to be that those exceptions to the *Reed* content-neutrality framework survive. *See, e.g., Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1198 n.3 (9th Cir. 2016) (maintaining that restrictions on commercial speech "need only withstand intermediate scrutiny," even after *Reed*); *Mass. Ass'n of Private Career Schs. v. Healey*, 159 F. Supp. 3d 173, 192 (D. Mass. 2016) ("Although only a small number of courts have addressed First Amendment challenges to commercial-speech regulations since *Reed*, almost all of them have concluded that *Reed* does not disturb the Court's longstanding framework for

commercial speech under *Central Hudson*."); Lee Mason, Comment, *Content Neutrality and Commercial Speech Doctrine After* Reed v. Town of Gilbert, 84 U. Chi. L. Rev. 955, 958 (2017). *But see Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228 (11th Cir. 2017) (stating there remains some uncertainty as to whether *Reed* upends the traditional framework for commercial speech). Plainly, though, the thrust of *Reed* is that content-based laws, as a general matter, are suspect. In my view, its strong, unqualified language cuts against the State's plea here to review the Maryland statute – a facially content-based law – under a less rigorous level of scrutiny.

An even more recent majority opinion by Justice Thomas sends the same signal. In *National Institute of Family and Life Advocates v. Becerra*, a group of crisis pregnancy centers challenged a California law that, among other things, required licensed clinics to disseminate a government-drafted notice advising that various public programs offer low-cost access to family planning services, including abortion. 138 S. Ct. at 2369. The Ninth Circuit denied the pregnancy centers' motion for a preliminary injunction, holding that the notice requirement survived a lower level of scrutiny applicable to regulations of "professional speech." *Id.* at 2370.

A five-member majority of the Supreme Court reversed. *Id.* The majority declined to follow several circuits' lead in recognizing "professional speech" as a separate category of speech, explaining:

> This Court has been reluctant to mark off new categories of speech for diminished constitutional protection. And it has been especially reluctant to exempt a category of speech from the normal prohibition on content-based restrictions. This Court's precedents do not permit governments to impose content-based restrictions on speech without persuasive evidence of a long (if heretofore unrecognized tradition) to that effect.

*Id.* at 2372 (alterations, citations, and quotation marks omitted). The Court concluded the state had failed to identify "a persuasive reason for treating professional speech as a unique category that is exempt from ordinary First Amendment principles." *Id.* at 2375.

Along the way, Justice Thomas's opinion recognized that the Court had, at times, "applied a lower level of scrutiny to laws that compel disclosures in certain contexts." *Id.* at 2372. Of note, in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985), the Court applied a lower standard to a rule requiring lawyers who advertised their services on a contingency-fee basis to disclose that clients might have to pay some fees and costs. Justice Thomas, though, gave *Zauderer* a narrow reading, holding it applied only to laws compelling disclosures of "uncontroversial information about the terms under which" advertised services will be available. *Becerra*, 138 S. Ct. at 2372 (quoting *Zauderer*, 471 U.S. at 651). He concluded the *Zauderer* standard did not apply to the California notice requirement, as it compelled disclosure of information about *state*-sponsored services and concerned a topic – abortion – that could hardly be considered "uncontroversial." *Id.*

*Becerra* counsels against the State's position here. First, it reaffirms the bedrock principle that content-based laws are presumptively unconstitutional. *See Becerra*, 138 S. Ct. at 2371. Second, it notes the Court's reluctance to recognize exceptions to this rule, absent "persuasive evidence of a long (if heretofore unrecognized tradition)" of regulation. *See id.* at 2372. That would be difficult for the State to show here, as its briefs make no claims that laws compelling publishers to make election-related disclosures have much of a history in this country. Lastly, *Becerra* signals that pre-*Reed* precedents according diminished First Amendment protection to certain categories of speech ought to be read narrowly.

The State urges me to take the opposite approach here, advising me to apply the *Buckley* "exacting scrutiny" standard more expansively than the Supreme Court or any federal appellate court have ever applied it.   My reading of *Reed* and *Becerra* persuades me that this would be improper.   The applicable standard, I am convinced, is strict scrutiny.   This is the standard I will now apply.

**5.**

Under strict scrutiny, the government bears the burden of showing the challenged regulation "furthers a compelling interest and is narrowly tailored to achieve that interest."   *See Reed*, 135 S. Ct. at 2231 (quoting *Bennett*, 564 U.S. at 734).

The State's briefing on Plaintiffs' motion does not bother to argue the Act is capable of surviving strict scrutiny, placing all its bets on the applicability of the exacting scrutiny standard, which I have rejected.   Nevertheless, at a hearing on Plaintiffs' motion, counsel for the State said he was "not prepared to concede" the point, arguing that an opportunity to further investigate the issue through the discovery process might bolster the State's position.   Counsel also suggested that the Act's requirements may yet be "refined" (translation: narrowed) in such a way as to survive strict scrutiny as the State Board of Elections exercises its power to promulgate regulations under the Act.

These are not the arguments of a party that is confident in its case.   To begin, the issue before me at this stage of the litigation is whether Plaintiffs' First Amendment claim is likely to succeed on the merits.   *See Winter*, 555 U.S. at 20.   Surely, it can always be argued that discovery *might* uncover facts that strengthen one party's position.   The State, though, has not identified any specific points of contention in this case that demand clarification through discovery.   The mere, ever-present possibility that some unknown and unanticipated new facts will emerge to prop up

the non-moving party's case is no reason to deny the moving party a preliminary injunction that is otherwise justified.

The State's other argument – that future regulations may refine the Act's requirements – is equally unpersuasive. The only way regulations could "implement" the Maryland statute in a way that would allow it to survive strict scrutiny would be to narrow its impact to such an extent that it would be contrary to what was enacted by the Maryland legislature. But, of course, "[r]egulations cannot overrule the statute under which they are promulgated." *Kemp v. Seterus, Inc.*, No. PJM-18-472, 2018 WL 3159070, at \*4 n.1 (D. Md. June 27, 2018); *see Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002) ("A regulation cannot stand if it is ' . . . manifestly contrary to the statute'" (quoting *United States v. O'Hagan*, 521 U.S. 642, 673 (1997))). If, as Plaintiffs contend, the Act is unconstitutional, it is rather difficult to see how regulations might save it. Only legislative action could.

That said, it remains the Plaintiffs' burden to show their claim that the Act fails strict scrutiny is likely to succeed on the merits. *See Winter*, 555 U.S. at 20. Here, that means Plaintiffs must show the Government is unlikely to satisfy its burden, either on summary judgment or at trial, of establishing, first, that the Act furthers a compelling interest and, second, that it is narrowly tailored to achieve that interest.

The first point does not appear to be in dispute. *See* Pls.' Mem. 18 ("assuming" the state has a compelling interest in combatting foreign meddling in U.S. elections). That is only right, as I would think it evident that states have a compelling interest in preventing foreign governments and their nationals from interfering in their elections. *See Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 285-86 (D.D.C. 2011) (Kavanaugh, J.) (upholding, under strict scrutiny, a federal law barring foreign citizens who temporarily live and work in the United States from making

campaign contributions and expenditures), *aff'd*, 565 U.S. 1104 (mem.); *see also Sugarman v. Dougall*, 413 U.S. 634, 648-49 (1973) (explaining that "citizenship is a permissible criterion for limiting" the right to vote or hold high public office).  If that was not already clear, the recent revelations of Russia's efforts to divide Americans and influence their votes ought to have resolved any doubts.  These operations laid plain what might have seemed obvious – that, for all of its many benefits, the Internet has opened up virtually limitless opportunities for hostile foreign powers, criminals, and terrorists to sow mischief and undermine our democratic institutions.  To characterize the State of Maryland's interest in addressing this threat as anything less than compelling would be a profound error; on the contrary, the Maryland legislature should be commended, not criticized, for attempting to address this threat to the fairness of its electoral process.

While it appears to me that the Act's primary purpose was to combat foreign meddling in the state's elections, this was certainly not its only aim.  *See* Test. of Common Cause Maryland, ECF No. 24, Ex. C (urging the bill's passage because "*both* unethical domestic campaigns and hostile foreign campaigns used social media to spread" disinformation in the 2016 election (emphasis added)).  The requirements that both political actors and publishers make certain disclosures in connection with online ads appear to serve two broader goals: informing voters about the source of online ads and deterring corruption.  *See* Md. Code Ann., Elec. Law §§ 13-306(b)-(d), -307(b)-(d), -405(b)-(c).  These, for purposes of a strict-scrutiny analysis, are also compelling governmental interests.  *See McConnell*, 540 U.S. at 205 ("[T]he Government has a compelling interest in regulating advertisements that expressly advocate the election or defeat of a candidate for federal office."); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995) (explaining that disclosure of candidates' expenditures serves a state's compelling interest in

"lessen[ing] the risk that individuals will spend money to support a candidate as a quid pro quo for special treatment after the candidate is in office").

But the difficulty for the State is that, under strict scrutiny, it must demonstrate that the challenged provisions of the Act are "narrowly tailored" to promote those interests, meaning that "no 'less restrictive alternative' would serve" its purposes. *Cent. Radio*, 811 F.3d at 633 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)).  There are two ways a regulation may fail this part of the test.  First, a regulation may be unconstitutionally overinclusive in that it "unnecessarily circumscribes protected expression." *Id.* (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002)).  Alternatively, a regulation may be unconstitutionally underinclusive, as where it "leaves appreciable damage to the government's interest unprohibited." *Id.* (quoting *Reed*, 135 S. Ct. at 2232).

Maryland's statute fails for both reasons.  It regulates substantially more speech than it needs to while, at the same time, neglecting to regulate the primary tools that foreign operatives exploited to pernicious effect in the 2016 election.

I begin with the publication requirement, Md. Code Ann., Elec. Law § 13-405(b), which strikes me as the most problematic of the Act's provisions.  This part of the Act compels online publishers to post state-mandated information on their own websites, treading on their First Amendment-protected interest in controlling the content of their publications. *See Pac. Gas*, 475 U.S. at 15-16 (holding that a regulation requiring a privately owned utility company to reserve space in its monthly billing envelope for materials prepared by a ratepayers' advocacy group "impermissibly requires [the utility] to associate with speech with which [it] may disagree," which is "antithetical to the free discussion that the First Amendment seeks to foster"); *Miami Herald*

*Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974) (stating that governmental "compulsion to publish that which '"reason" tells [a newspaper] should not be published' is unconstitutional").

The veritable infiniteness of cyberspace does not cure this constitutional infirmity. I grant that requiring state-mandated disclosures to appear on a news website does not necessarily take up space the site's owner might otherwise devote to other content. *See Tornillo*, 418 U.S. at 256-57 & n.22. The requirement fails strict scrutiny regardless, though, because of its "intrusion on the function of editors." *Id.* at 258. The Supreme Court's opinion in *Miami Herald Publishing Co. v. Tornillo* makes precisely this point, concluding that a "right of reply" statute compelling newspapers to print a political candidate's response to critical coverage would violate the First Amendment "[e]ven if [the] newspaper would face no additional costs to comply with [the] compulsory access law and would not be forced to forgo publication of news or opinion." *Id.* The Court explained:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Id.* This respect for a publisher's right to exercise "editorial control and judgment" is not reserved for print media alone; it applies with equal force to outlets that publish content on the Internet.

The State cannot – and, in fact, does not – argue that the publication requirement is the least restrictive means available of achieving its interest in informing the electorate because, as it happens, Maryland campaign finance laws prescribe other means of obtaining the same information. These laws require political committees to report all of their expenditures to the State Board of Elections. *See* Md. Code Ann., Elec. Law §§ 13-304(b)(1), -309(a), (c). They require

similar reports from people who make at least $10,000 in independent expenditures or spend at least that much on political ads during an election cycle.[18] *See id.* §§ 13-306(c), (e), -307(c), (e). The State has not explained why it is necessary to impose duplicative requirements on publishers.

The state inspection requirement also fails strict scrutiny. While certainly less offensive to the First Amendment than the publication requirement, *see Riley*, 487 U.S. at 795 (stating, in dicta, that a law compelling disclosures to state regulators may survive a constitutional challenge even if it would offend the Constitution to compel the same disclosures in direct communications with members of the public); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.16 (1984), this part of the Act suffers from some of the same defects. Here, again, there is a problem of overinclusiveness. The State could require the ad buyers themselves to keep records of the sort section 13-405(c) requires. This would place the burden of compliance on the speakers themselves, who, after all, are the ones seeking to influence public discourse. Placing the burden on media outlets enlists the press in the government's regulatory scheme, a prospect that is fundamentally at odds with the essential role a free and independent press has historically played in holding government to account. *See Estes v. Texas*, 381 U.S. 532, 539 (1965); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 249 (1936).

Even if I were to conclude that such impositions on the press might be tolerable under the First Amendment, the Act's state inspection requirement – like the publication requirement – would still be unconstitutionally overinclusive. This is because the Act imposes its obligations on any and all "online platforms," a term it defines to include "any public-facing website, web application, . . . social network, ad network, or search engine" that accepts ads and that can claim

---

[18] The Act expanded these requirements to include expenses on online ads. *See* 2018 Md. Laws 834.

"100,000 or more unique monthly visitors or users for a majority of months during the immediately preceding 12 months." Md. Code Ann., Elec. Law § 1-101(dd-1). This definition casts a wide net. It is broad enough to ensnare not only Facebook, Instagram, and other social media giants that foreign operators are known to have exploited, but many news sites as well, including smaller, regional sites. *See* Publisher Affs., ECF Nos. 9-5 to -9. And yet, the State has not been able to identify so much as a single foreign-sourced paid political ad that ran on a news site, be it in 2016 or at any other time.

It is clear enough that a state could fashion a more narrowly tailored regulation than the one Maryland has enacted. New York, in fact, has done just that; its definition of "online platform" closely resembles Maryland's but requires the site to have at least 70 million "unique monthly United States visitors or users for a majority of months during the preceding 12 months." 9 N.Y. Comp. Codes R. & Regs. 6200.10(b)(12) (2018). I do not mean to suggest that the threshold in Maryland must be in line with the one in New York – which, after all, is a considerably more populous state. Strict scrutiny, though, demands an exceedingly tight fit between the regulation's burdens and its aims. It seems unlikely that Maryland will be able to show that a less expansive definition of "online platform" would detract in any way from the Act's goal of neutralizing foreign influence in the state's elections.

This alone would justify a determination that Plaintiffs' First Amendment claim is likely to succeed on the merits. Ultimately, though, the Act appears to suffer from an even more fundamental defect in that it solely targets "qualifying paid digital communications" – which is to say, political advertisements a buyer pays to place on an online platform. *See* Md. Code Ann., Elec. Law § 1-101(ll-1). As the legislative history of the Act and the Albright declaration make clear, the primary evil the Act was intended to redress was *unpaid* Internet postings (many of

which mentioned no election or candidate at all) on social media sites that are not news publishers. Thus, the reach of the Act is dramatically broader than the threat it was chiefly enacted to counter.

Strict scrutiny is demanding, to say the least. *See Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015) (noting that speech restrictions withstand strict scrutiny only in "rare cases"). Here, there is simply no way the State can show its law is the least restrictive means of achieving its compelling interest in deterring or exposing foreign attempts to meddle in its elections. I conclude Plaintiffs will likely succeed in demonstrating the Act fails strict scrutiny.

**6.**

As I have noted, the State made little attempt to argue its statute could overcome strict scrutiny. Its brief asserts, instead, that the applicable standard of judicial review is the "exacting scrutiny" standard the Supreme Court promulgated in *Buckley*, and that Maryland's law survives this level of scrutiny. While I am under no obligation to decide this question, I have thoroughly reviewed the parties' arguments and the case law, and I am satisfied the State's argument is unavailing. I will pause here to explain why the Act would not pass muster even under this lesser standard of review.

*Citizens United* explains that the "exacting scrutiny" standard "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." 558 U.S. at 366-67 (quoting *Buckley*, 424 U.S. at 64, 66). This standard is certainly less rigorous than strict scrutiny. Even so, as the Seventh Circuit has stated, exacting scrutiny "is not a loose form of judicial review." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 840 (7th Cir. 2014); *see Minn. Citizens*, 692 F.3d at 876 ("[E]xacting scrutiny is more than a rubber stamp."). The appellate court explained:

> In the First Amendment context, fit matters. Even when the Court is not applying strict scrutiny, we still require 'a fit that is not

> necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective.

*Wis. Right to Life*, 751 F.3d at 840-41 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).

In this context, "exacting scrutiny" does not require the government to show its interest is "compelling," with all that that word has come to entail in strict scrutiny cases. *See Turner Broad. Sys.*, 512 U.S. at 680 (O'Connor, J., concurring in part and dissenting in part) (stating that, under strict scrutiny, "[i]t is not enough that the goals of the law be legitimate, or reasonable, or even praiseworthy," but rather "[t]here must be some pressing public necessity, some essential value that has to be preserved"). Rather, it is enough for the State to show that the strength of its interest "reflect[s] the seriousness of the actual burden on First Amendment rights." *John Doe No. 1*, 561 U.S. at 196 (quoting *Davis*, 554 U.S. at 744). Here, though, I have already explained that the State has a compelling interest in the Act's primary aim of shielding its elections from foreign influence, as well as in its secondary goal of promoting electoral transparency. It necessarily follows, then, that these interests are "sufficiently important" to conceivably justify a campaign finance disclosure requirement under *Buckley*.

The State and *amici* have each sought to highlight the Act's secondary aim, suggesting that disclosure requirements must survive exacting scrutiny, as a matter of course, because of their potential to inform the electorate and expose corruption. *See* Defs.' Opp'n 17-18 (citing *Citizens United*, 558 U.S. at 369); Br. of Amicus Curiae 14. The case law does not support this proposition. To be sure, the Supreme Court and various appellate courts have agreed that particular campaign-finance disclosure requirements were substantially related to the government's interests in

promoting transparency and deterring corruption. *See, e.g., Citizens United*, 558 U.S. at 367-71; *Indep. Inst.*, 812 F.3d at 789. Certainly, though, no court has ever gone so far as to declare that all disclosure requirements – no matter how over- or under-inclusively they support an important government interest – are constitutional. On the contrary, the Supreme Court has twice struck down a disclosure requirement under the *Buckley* exacting scrutiny standard. *See Davis*, 554 U.S. at 744; *ACLF*, 525 U.S. at 204.

Of those cases, one strikes me as particularly instructive. In *Buckley v. American Constitutional Law Foundation* (ACLF), 525 U.S. 182 (1999), which I discussed in brief above, the Court assayed a Colorado law that imposed disclosure obligations on ballot initiative proponents that employed paid petition circulators. The Tenth Circuit had preserved the statutory scheme in part but rejected provisions requiring proponents to disclose each circulator's name and address, along with the amount of money the circulator charged. 525 U.S. at 201. The Supreme Court affirmed, agreeing with the Tenth Circuit that forcing circulators to surrender their anonymity did little to advance the statute's goals, which were to inform voters about the moneyed interests behind a ballot initiative and deter corruption. *Id.* at 203-04.

*ACLF* provides a vivid example of a mismatch between a disclosure requirement's means and its ends. The requirement was not entirely devoid of value; as Justice O'Connor observed in her partial dissent, the requirement mandated the disclosures be made while circulation efforts were ongoing, which might conceivably have assisted members of the public in "evaluat[ing] the sincerity or, alternatively, the potential bias of any circulator that approaches them." *ACLF*, 525 U.S. at 224 (O'Connor, J., concurring in judgment and dissenting in part). But exacting scrutiny requires a showing that the means adopted by the state are sufficiently effective in achieving an important state objective without doing unwarranted collateral damage to First Amendment rights.

The Colorado law failed this standard because its benefits, whatever they might have been, were too remote to justify the compelled disclosure. *See id.* at 203-04.

Maryland's statute similarly misses its mark. It is not that the Act promises no benefits whatsoever. Here, though, the publication and state inspection requirements appear ill suited to their missions in at least three ways: first, they are duplicative of other campaign finance disclosure requirements; second, they do not target the deceptive practices the Act ostensibly seeks to deter; and, third, they are poorly calibrated to prevent foreign operatives from evading detection.

I have already addressed the first of these defects. Under subsection 13-405(b) (the publication requirement), online publishers must disclose the identity of political ad buyers and the total amount paid for each ad. *See* Md. Code Ann., Elec. Law § 13-405(b)(6). But Maryland campaign finance laws, as amended by other portions of the Act, already require the ad buyers themselves to disclose this same information. *See id.* §§ 13-304(a)-(b), -306(c)-(e), -307(c)-(e).

Subsection 13-405(c) (the state inspection requirement) also overlaps with other campaign finance disclosure requirements. Specifically, this subsection requires online publishers to keep records that, among other things, identify the candidate or ballot issue to which each ad relates and whether the ad supports or opposes that candidate or ballot issue. *See id.* § 13-405(c)(3)(i). This is information state law elsewhere requires the groups or people who pay for political ads to themselves disclose. *See id.* § 13-306(e)(4).

To be sure, the state inspection requirement is not entirely duplicative. Several of its demands go farther than other Maryland campaign finance disclosure requirements – in particular, the obligation to maintain records of the dates and times the ads appeared online; an "approximate description" of the ad's audience and the "geographic locations" where it appeared; and the total number of "impressions" the ad generated. *Id.* § 13-405(c)(3)(ii), (iv)-(vi). Nowhere, though, has

the State articulated its interest in this information.  It is far from clear how forcing online publishers to reveal details about the number, demographic makeup, and geographical dispersion of visitors to their site might advance the Act's goals.  This information does not offer voters any useful insights about the sources or funding of campaign ads or shine a light on any bribery schemes in which a candidate might be embroiled.  *See Buckley*, 424 U.S. at 66-67.  And, certainly, it is difficult to see how these disclosures might possibly contribute to the Act's chief aim of deterring foreign meddling in federal and state elections.

What is clear, at least, is that publishers have a legitimate grievance with a law that obligates them to cough up proprietary information about their customer base and the reach of their websites (information akin to circulation figures for traditional print media).  The compelled disclosure of this information could expose their proprietary data − if not necessarily to competitors, then at least to the state, which may well count itself as a participant in the market for online ads.  Given the risks, a publisher that prizes the privacy of its data might find it preferable to simply decline to accept political ads − a prospect that runs counter to the First Amendment's aim of promoting the free expression of ideas.

This leads me to the second of the Act's most critical defects: its failure to remedy the harms that inspired its enactment.  I have already discussed this failing in some detail, and there is no need to repeat myself here.  In short, the Act's publication and state inspection requirements overshoot their target by a wide margin.  They regulate international, regional, and local websites alike, even as all available evidence suggests that foreign operatives largely confined their activities to Facebook, Instagram, and other global social media platforms.  *See* Indictment at 5-6, *Internet Research Agency*, No. 18-cr-32-DLF; Albright Decl. 7-8; Brennan Center Testimony 2.  At the same time, the Act reserves its fire for paid political advertisements, even though it appears

the Russian disinformation campaign relied far more heavily on fake websites and free social media posts. *See* Albright Decl. 6.

These are just two of the ways in which the Act's requirements and its aims are substantially mismatched. Plaintiffs have identified one more, and it concerns the Act's efficacy. The issue, in brief, is that the Act leaves it to ad buyers to trigger the publication and state inspection obligations by notifying online publishers that their ad meets the statute's definition of a "qualifying paid digital communication." *See* Md. Code Ann., Elec. Law § 13-405(a), (d)(1). A buyer who wishes to avoid detection – as any self-respecting foreign operative surely would – can simply withhold the notice, in which case the publisher never incurs an obligation to disclose any information about the ad. *See* Indictment at 19, *Internet Research Agency*, No. 18-cr-32-DLF (alleging that Russian operatives who meddled in the 2016 election did not report their expenditures to the FEC or register as foreign agents with the Department of Justice). Alternatively, the buyer could submit false information to the publisher; in that case, the publisher would be obliged to make the requisite disclosures but would be permitted by law to "rely in good faith on the information" the buyer provided. *Id.* § 13-405(d)(2). In either case, the state is no closer to achieving its aim of rooting out foreign attempts to interfere in its elections.

These infirmities separate Maryland's statute from the more traditional campaign-finance disclosure requirements that have withstood exacting scrutiny. *See, e.g.*, *Indep. Inst.*, 812 F.3d at 798; *Del. Strong Families*, 793 F.3d at 310-11; *Justice*, 771 F.3d at 299. The appellate courts' decisions in those cases reflect the continued vitality of the *Buckley* Court's pronouncement that requiring candidates, political committees, and other speakers to disclose details about their expenditures is often "the least restrictive means of curbing the evils of campaign ignorance and corruption." 424 U.S. at 68. Here, though, Maryland has promulgated a rather different type of

statute – one with a distinct set of obligations and objectives.  The State has not persuaded me that the Act's publication and state inspection requirements are substantially related to its aims.  The method it has chosen to remedy an admittedly important state interest is ill suited to the task and threatens in the process to impose substantial burdens on Plaintiffs' First Amendment-protected rights of free speech and a free press.  I conclude, accordingly, that the challenged portions of the Act likely would not overcome exacting scrutiny.

**B.**

Of course, it is not enough for Plaintiffs to show their First Amendment claim is likely to succeed on the merits, as this is merely the first of the four factors a court must address on a motion for preliminary injunctive relief.  Under *Winter*, Plaintiffs must also show they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  555 U.S. at 20.  Although the State has not said much to challenge Plaintiffs' arguments on these factors, I will briefly address them.

I start with the second factor (irreparable harm).  Here, the analysis is straightforward.  Maryland's statute trenches on Plaintiffs' First Amendment rights, which will irreparably harm Plaintiffs as a new election cycle gets under way.  *See Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("[T]he Supreme Court has explained that 'loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21 (4th Cir. 2002).  The State's argument that the impositions on Plaintiffs are relatively "modest" is off point.  *See* Defs.' Opp'n 35.  Even if I were to agree, the question is not whether the anticipated harm is severe, but whether it is irreparable.  Here, in the absence of preliminary relief, Plaintiffs would have no choice but to prepare to

accommodate the Act's requirements and decide whether to accept or reject political ads as they begin to pour in.   Plainly, the second factor weighs in Plaintiffs' favor.   *See Sindicato Puertorriqueno de Trbajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012).

The third and fourth *Winter* factors are also easily satisfied.   As these factors tend to raise similar considerations, courts often consider them in tandem.   *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 602 (4th Cir. 2017), *vacated and remanded on other grounds*, 138 S. Ct. 353 (2017); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013).   While, in rare cases, equitable considerations might counsel against enjoining an unconstitutional statute, *see NAACP-Greensboro Branch v. Guilford Cty. Bd. of Elections*, 858 F. Supp. 2d 516, 526-27 (M.D.N.C. 2012), it is generally recognized that upholding constitutional rights is preferable to allowing a state to enforce an invalid law.   *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).   I have no difficulty concluding here that the balance of equities tips in Plaintiffs' favor and that preliminary relief is in the public's interest.

Plaintiffs have met their burden on all four of the *Winter* factors.   I conclude, accordingly, that preliminary injunctive relief is warranted.

## CONCLUSION

The 2016 election exposed alarming new vulnerabilities in this country's democratic processes.   While there is no denying that states have a strong interest in countering newly emerging threats to their elections, the approaches they choose to take must not encroach on First Amendment freedoms that are the hallmark of our nation.   Maryland's statute appears to overstep these bounds.   While I have no cause to block its enforcement wholesale, Plaintiffs have persuaded me that Md. Code Ann., Elec. Law § 13-405, which includes both the publication requirement and state inspection requirement, is most likely unconstitutional as it applies to these Plaintiffs.   With

respect to this section and to section 13-405.1, which authorizes the state administrator of elections to investigate potential violations of section 13-405, the Motion for Preliminary Injunction is granted. Accordingly, the State is enjoined from enforcing these provisions against Plaintiffs during the pendency of this suit.

Plaintiffs have challenged the Act on broader grounds than I have discussed in this ruling; while their arguments primarily have focused on how the Act applies to them, they also contend it is facially unconstitutional. It is not necessary for me to address this contention at present, because the grounds discussed warrant the injunctive relief they seek at this stage in the litigation. Before determining what, if any, further proceedings are necessary to conclude this case, I will schedule a telephone conference call with counsel. The State may well wish to file an interlocutory appeal, and if so it may be prudent to stay further proceedings until the appeal has been decided.

A separate order follows.

Date:  January 3, 2019

Paul W. Grimm
United States District Judge